APPEAL OF RINDGE LAND & NAVIGATION CO.

Docket No. 3698.   Submitted August 16, 1925.   Decided November 4, 1925.

> Where the taxpayer caused four reclamation districts to be organized to include only its lands, and used the warrants issued by such districts to pay off mortgages and indebtedness constituting valid liens upon said lands, which warrants created a statutory lien upon said lands for the face value thereof, *held*, that the transaction resulted in the substitution of one debt for another, without realized gain to the taxpayer.

*Marcus F. Mitchell, Esq.*, for the taxpayer.
*A. Calder Mackay, Esq.*, for the Commissioner.

Before GRAUPNER, TRAMMELL, and PHILLIPS.

This appeal is from the determination of deficiencies in income and profits taxes for the years 1918, 1919, and 1920.   The amounts of the deficiencies for the respective years are $13,703.88, $158,766.64, and $1,457.05, a total of $173,927.57.   The entire amount of the deficiencies is not at issue.   The questions to be determined are whether the Commissioner erred in refusing to allow deductions claimed on account of depreciation for the years 1918, 1919, and 1920, and whether the amount of $508,990.11 was erroneously added to income for the year 1919 upon a refinancing of the taxpayer's bonded and floating debt through the creation of reclamation districts and the issuance of bonds by such districts to refund the indebtedness.

FINDINGS OF FACT.

1. The taxpayer at all times herein mentioned was a corporation organized under the laws of the State of California. At the time of its organization in 1906, it acquired title, from three smaller corporations, to approximately 22,500 acres of swamp and overflowed land in San Joaquin and Contra Costa Counties, in that State. As a part of the purchase price of this land, the taxpayer assumed all of the indebtedness of the smaller corporations, a part of which consisted of $400,000 bonded indebtedness due in 1922, which was secured by a mortgage upon a part of the land acquired.

2. In the year 1906 the taxpayer issued bonds for $800,000, due in 1926, secured by a mortgage upon all of its lands. This bonded indebtedness was in addition to that assumed by the taxpayer at the time of purchase. The lands in question are situated in the delta district of the Sacramento and San Joaquin Rivers and are known as " swamp and overflowed lands." Before they could be of any value for agricultural purposes it was necessary to reclaim them from overflow by flood waters and provide for irrigation by the construction of levees, drainage canals, irrigation ditches, pumping plants, etc. These levees and drainage canals, together with pumps, syphons, and other instrumentalities, serve to prevent the land from being flooded during periods of high water in the rivers and to irrigate it when it is in need of water.

3. At the time the taxpayer acquired title to the above lands, only a portion had been reclaimed, and it immediately undertook to construct the works 'necessary to complete the reclamation of and to irrigate the remaining portions. By March 1, 1913, it had completely reclaimed the entire 22,500 acres. The purchase price, when it acquired the land in 1906, included the lands, structures, and reclamation works then existing on the land, and no segregation was made upon. the taxpayer's books of the cost of the structures and reclamation works which then existed. Until the year 1919, when the transaction herein involved took place, the taxpayer farmed its lands and maintained and operated the reclamation works as one enterprise.

4. By April 1, 1919, the taxpayer had accumulated a floating indebtedness of $405,000, and its bonded indebtedness was $1,193,500. The Los Angeles Trust & Savings Bank carried most of the floating indebtedness and was trustee under the trust agreement for all of the mortgage bonds. The directors of the taxpayer became worried over these conditions, particularly as a part of the bonded indebtedness would become due in three years and there was no apparent method of accumulating the money with which to meet it. The

taxpayer was being urged by its bank to take some steps to meet its floating indebtedness, which was past due, and the directors were fully cognizant of the fact that under the then existing conditions the time for payment of the bonded indebtedness of $800,000, due in 1926, must be extended. They sought a plan of refinancing both the bonded and floating indebtedness which would provide longer maturities. After conferring among themselves, the directors consulted attorneys and were advised that, under the reclamation district laws of California, a plan for refinancing the taxpayer's obligations could be evolved which would be suited to its needs. It was decided that the taxpayer should organize its lands into four reclamation districts which topographical conditions permitted naturally. This decision was reached with the thorough understanding between the directors of the taxpayer and the trustee under the outstanding mortgages that the organization of irrigation districts was to be done solely for the purpose of refunding its debts and that the taxpayer would conduct and manage the lands and reclamation works as it always had. Before taking the formal steps to organize the reclamation districts, the taxpayer agreed with the bank to exchange sufficient reclamation district bonds with the holders of the outstanding mortgage bonds to refinance its bonded indebtedness, and to sell the remaining reclamation district bonds on the market and use the proceeds in liquidating the taxpayer's floating indebtedness. The taxpayer also made arrangements with a bond sales company to acquire such of the outstanding mortgage bonds as it could and exchange them with the bank for the new reclamation bonds. A full plan for discharging the floating debt and bonded debt through the sale or exchange of the irrigation district bonds was worked out before the organization of the districts was attempted.

5. After these refinancing arrangements had been made, the taxpayer took the legal steps necessary to organize the district and have an assessment lien placed upon its lands in the sum of $2,000,000. Of this amount $1,700,000 was considered necessary to refinance its bonded obligations, pay its floating indebtedness, and meet the expenses of organizing the districts and floating the bond issue. The remaining $300,000 was not to be issued but was to be held to provide funds for future development work, maintenance, and improvements on the reclamation work.

6. The organization of the four reclamation districts and the issuance of the bonds under the California statutes required compliance with many legal formalities. It was accomplished in the

following manner: The taxpayer owned all of the land which was to be included in the proposed reclamation districts and which had already been reclaimed with the money the taxpayer had invested or then owed. Early in April, 1919, it filed petitions with the boards of supervisors of the counties in which the land was situated, stating its purpose to organize four reclamation districts, setting up the boundaries of each proposed district and such other information as the law required. Said petitions were approved by the boards of supervisors of the respective counties in which the lands were situate in the early part of May, 1919. A board of three trustees was duly elected in each of the four districts. The trustees in each of the four districts were identical. All of the land in each district being owned by the taxpayer, two trusted employees and the son of the principal stockholder were each deeded small tracts of land in each district for the purpose of making them landowners and qualifying them to vote for and act as trustees, but they immediately executed deeds transferring the land so conveyed back to the corporation, which deeds were and still are held by the company unrecorded. After said petitions were approved and the trustees elected and qualified, a transfer of the rights of way for levees, drainage canals, ditches, and roads, and of the pumping plants and other machinery was made by the taxpayer to the reclamation districts. This was done by four separate deeds, which recited a total consideration of $1,700,000. These deeds reserved the fee and did not convey fee title to any of the property.

The consideration recited had no relation to the value of the reclamation works transferred, but was arbitrarily based upon the amount of money that was necessary for the corporation to raise in order to refinance its obligations. Upon the transfer to the four districts of the reclamation works above referred to, the districts issued their warrants in the total sum of $1,700,000, payable to the taxpayer. These warrants, after being signed by the trustees of the districts, were taken to the county treasurers of the respective counties about December 1, 1919, by the attorney who represented both the trustees of the districts and the taxpayer, and there registered; after which, and on or about December 4, 1919, they were placed by the same person with the bank, according to the prior agreement. This was done to prevent them from becoming an outstanding lien on the lands which would be superior to the outstanding mortgage bonds and, also, to enable the bank to exchange the warrants with the county treasurers for the reclamation district bonds when they were later issued. There was no cash in the county treasury to the credit of the districts with which to pay the warrants, and the registry was but a step in the legal process of issuing the bonds. After the warrants were registered by the county treasurers they were never

again in the possession or under the control of the taxpayer. The assessments necessary to create the liens upon which to predicate the bond issues were levied in October and November, 1919. Subsequently, and in December, 1919, the bonds were voted by the landowners, issued by the trustees of the reclamation districts, signed by the county treasurers of the respective counties and advertised for sale as provided by the laws of the State of California in such cases. At the time said bonds were advertised for sale, the taxpayer took steps to prevent others from bidding for the bonds and filed its own bid in the amount of the warrants. On the date fixed for the sale of said bonds, a representative of the bank, which held the warrants in escrow, accompanied the representative of the taxpayer to the offices of the respective county treasurers, passed the warrants to the treasurers and received $1,700,000 reclamation district bonds in exchange. The bank, in accordance with the terms of its escrow agreement, then took the reclamation district bonds and exchanged so many of them as were necessary to retire the mortgage bonds, and held the surplus as collateral to secure taxpayer's floating indebtedness until such time as they were sold and applied to liquidate such indebtedness. Although the reclamation district bonds were advertised for sale by the respective county treasurers in 1919, they were not actually exchanged with or taken over by the trustee under the outstanding mortgages, under the above-mentioned agreement, until February, 1920. The whole transaction was conducted by the taxpayer as its own and for the definite and sole purpose of refinancing its outstanding obligations.

7. Since the organization of the four reclamation districts, the taxpayer has not sold any of the land contained therein and is now and ever since the formation of such districts has been the owner of all of such land. It has used the canals for its own purposes and farmed all the available land devoted to reclamation purposes ever since 1919, in the same manner as it had done before that date, and since that time all the repair and maintenance work on the reclamation properties has been done by and at the expense of the taxpayer.

8. The Commissioner asserts that the transfer of the reclamation work and equipment in 1919 was a sale from one legal entity to another and that the taxpayer made a profit thereon. The Commissioner determined the cost of the reclamation works to the taxpayer to be $1,193,000, and fixed the value of the reclamation bonds at par. The difference between the cost of the reclamation works, as fixed by the Commissioner, and the $1,700,000 face value of the bonds was determined to be income, and the greater portion of the deficiency in taxes against the taxpayer for the year 1919 results from this determination.

9. The taxpayer claimed that the Commissioner erroneously refused to allow the amount of $30,041.28 as a deduction from gross income for depreciation in the year 1918; the amount of $17,491.87 as a deduction from gross income for depreciation for the year 1919; and the amount of $10,066.19 as a deduction from gross income as depreciation for the year 1920. At the hearing of the appeal, the March 1, 1913, value of the depreciable assets and the rate of depreciation applicable to each class of assets were agreed upon by counsel. Under the stipulation the taxpayer is entitled to additional depreciation in the amount of $20,051.99 for 1918 and $4,906.27 for 1919. For the year 1920 there should be added to income the amount of $1,105.52, which represents depreciation allowed by the Commissioner in excess of that actually sustained.

### DECISION.

The deficiency should be computed in accordance with the foregoing findings of fact and the following opinion. Final determination will be settled on consent or on 15 days' notice.

### OPINION.

GRAUPNER: The issues relating to allowance of depreciation having been disposed of by stipulation, there remains for our consideration only the question whether the taxpayer made a profit from the refinancing operations. The Commissioner contends that, under section 202 of the Revenue Act of 1918, the taxpayer realized a taxable gain on the transfer of the reclamation works to the four reclamation districts in 1919. The taxpayer alleges three propositions in contravention of the Commissioner's position: (1) That the taxpayer and reclamation districts are each component parts of the same business enterprise, wholly controlled, managed, operated, and financed by the taxpayer, and that they should not be treated as separate entities for tax purposes; (2) that, if it can be said the taxpayer received anything from the transaction, what it did receive was borrowed money and not income; (3) that, conceding the taxpayer to be wrong in the foregoing propositions, the Commissioner should have deducted from the amount received, not cost, but the fair market value of the reclamation works on March 1, 1913, assuming that such value was greater than cost.

To determine either or both of taxpayer's first two propositions requires a consideration of the nature of a reclamation district under the California laws. It was stipulated at the hearing of the appeal that the four districts herein involved were properly organized and conformed to the statutory requirements, so we need not discuss that element in this opinion.

When Mexico ceded the lands which now compose the State of California under the treaty of Guadalupe Hidalgo, the United States became the sovereign proprietor of those lands, commonly described as " swamp and overflowed lands," in the delta district of the Sacramento and San Joaquin Rivers which had not been granted into private ownership by the Governments of Spain or Mexico. Subsequent to the admission of California into the Union, Congress passed title to these lands to the State. At a later date the legislature of the State enacted statutes which provided for the sale of these lands to private persons. In the course of time all of these lands were sold. The soil of these delta lands was extremely fertile but it could not be cultivated until leveed to protect it from the spring floods of the two rivers and ditched to drain off the surface waters and also lower the water table. The cost of such work was in most cases prohibitive to small landowners, unless cooperative operations could be carried on to reclaim the lands. Out of this need there developed a system which was the predecessor of the present reclamation district.

While various methods were employed, all of them approximated the following practice: The owners of contiguous lands would agree upon a plan for the reclamation of their joint properties. They would then execute a deed of trust by which they transferred the lands, or the rights of easement for reclamation purposes, to trustees. The trustees were empowered by the trust instrument to construct and maintain reclamation works in accordance with the plan and to levy assessments on the lands to defray the cost of construction and the expense of maintenance. The assessments became a first lien upon the lands under the terms of the trust instrument, and the trustees were empowered by the deed of trust to sell any of the tracts of land upon default in payment of any such assessment by the owner thereof. This practice developed without specific statutory authority, but was the forerunner of the law of the State creating reclamation districts for the accomplishment of the same purposes.

The reclamation districts organized under the California law are of such a peculiar character that it is difficult to describe them. The California statutes do not define a reclamation district. It is easy to determine from the decisions of the California courts what the districts are not, but is difficult to give a definition of what they are. A reclamation district is not a municipal corporation. *People v. Sacramento Drainage District,* 155 Cal. 373; 103 Pac. 207; *Sels v. Greene,* 88 Fed. 129. It is not a corporation within the purview of the classes of corporations defined by section 284 of the Civil Code, nor does it come within the article and section of the State constitution enjoining the creation of corporations except by general

laws. *Reclamation District No. 70* v. *Sherman*, 11 Cal. App. 399; 105 Pac. 277. It can not be taxed by the county or State, for it is a public agency, created in the furtherance of public policy, to reclaim lands for the benefit of the State and the public. *Reclamation District No. 551* v. *Sacramento County*, 134 Cal. 477; 66 Pac. 668. It is not a public or private corporation. *People* v. *Reclamation District No. 551*, 117 Cal. 114; 48 Pac. 1016. It can not be sued until such time as an action against it is authorized by law. *San Francisco Savings Union* v. *Reclamation District No. 124*, 144 Cal. 639; 79 Pac. 374.

It has been held that the drainage and reclamation of lands is a legitimate exercise of the State police powers. *Gray* v. *Reclamation District No. 1500*, 174 Cal. 622; 163 Pac. 1024. Reclamation districts are public agencies, to which the State has delegated some of its powers, which would cease to exist when the policy of the State has changed so that they are no longer required, or when there is no further function for them to perform. *Reclamation District No. 70* v. *Sherman*, 11 Cal. App. 399; 105 Pac. 277; *People* v. *Sacramento Drainage District*, 155 Cal. 373; 103 Pac. 207. The decisions of the California courts aid us but little in making any further definition of a reclamation district, and we must turn to the sections of the Political Code of that State for further light on its character and powers.

We find that the inhabitants of a district have no powers and no rights as such. When a district is being organized, the trustees are not selected because they are residents but because they are owners " of record of land within said district." Pol. Code, sec. 3453. They are not required to reside on the property. They are elected not by the residents of the district but by the " bona fide owners of the lands of the districts," each of whom has " one vote for each one dollar's worth of real estate owned by him or her in the district." Pol. Code, sec. 3491. Assessments to meet costs and expenses, either prospective or for which warrants have been issued, are levied by the trustees of the district, after certain legal formalities are complied with, Pol. Code, sec. 3456; and the trustees sell the property upon which assessments remain unpaid. Pol. Code, sec. 3466. The trustees perform all functions, except that, when a bond issue is proposed, an election must be held, at which " each owner of lands in the district shall be entitled   *   *   *   to cast one vote for each dollar's worth of real estate owned by him in the district." Pol. Code, sec. 3480.

A reading of all the sections of the Political Code relating to reclamation districts leads us to believe that, while the district is a public agency exercising through its trustees certain powers delegated by the sovereign, the district and the trustees are also the agents of the

landowners and the trustees hold only by the grace and as trustees of such landowners. Neither the district nor the trustees thereof perform a single function for themselves. Everything done is for the protection and at the expense of the land within the districts.

When assessments are levied neither the trustees nor the districts are liable, but they become a lien upon the lands within the district, Pol. Code, sec. 3463; and the trustees may sell any lands upon which the assessment has not been paid, without necessity of foreclosure proceedings. Pol. Code, sec. 3466. Where bonds are issued, as by the districts involved in this appeal, the obligation constitutes a lien upon all the lands within the district. Before the bonds are issued an assessment roll is prepared which fixes the amount of the assessment to be paid upon each parcel in the district for the retirement of the bonds and interest. The amount assessed becomes a lien upon the respective parcels. Payment of the assessment is called for as required, and any of such lands, upon which any assessment to pay interest on or redeem the bonds has been levied, may be sold, without foreclosure proceedings, to pay any delinquent assessment thereon. Pol. Code, sec. 3480.

With these points in mind, we may now consider the assignments of error made by the taxpayer in its petition. However, we would first say that the taxpayer can not be affiliated with the four reclamation districts under the provision of section 240 of the Revenue Act of 1918, because such districts do not come within the classification of corporations contemplated by that section.

The taxpayer asserts that it and the four districts are component parts of the same enterprise and can not be separated, in fact or in law, so that they can be treated independently for tax purposes. In considering this issue we must confine our discussion and decision to the particular facts and conditions presented by this appeal.

At the opening of the year 1919, the taxpayer was in an unsound financial condition and faced with the necessity of meeting obligations which it was not prepared to pay. It sought a means of meeting its obligations or prolonging the dates of maturity thereof. The only apparent relief was that of creating reclamation districts from its lands and utilizing the provisions of the reclamation district laws in order to issue new bonds wherewith to refund its outstanding indebtedness. It accordingly proceeded to organize four districts and to use the bonds, which were issued by such districts, to pay off its indebtedness.

It is true that the reclamation districts were organized, that they existed, and that the taxpayer deeded to them the reclamation works, with rights of way therefor, and the necessary equipment. But, apart from these facts, the taxpayer did with the lands and properties as it had before the districts were organized. It carried on

the reclamation and maintenance work, it farmed the available lands within the transferred rights of way, it paid all costs of construction and maintenance, and it operated, managed, controlled, and maintained the reclamation works and the farm lands as one enterprise. There was no actual change in control or conduct after the districts were formed. If we read the California statutes aright, it was not contemplated that the landowner should be deprived of anything by the organization of reclamation districts. On the contrary, the landowner, by its vote in dollars of value, was to control the district. The district was its agent, created at its request, and vested with certain powers by the State, only because those powers were necessary to perform certain acts for the benefit of the landowner. It took nothing away from the landowner but those easements necessary for levees, canals, and ditches, and those were always subject to use by such landowner. If the district had any funds which were not necessary for reclamation purposes, it was compelled to distribute them to the landowner. Pol. Code, sec. 3454 (12). A district could do nothing for itself; it could only act for the benefit of the landowner as its agent for the one restricted and specific purpose of reclaiming land. Where there is but one landowner, as in this appeal, a reclamation district is nothing more than a legal fiction—an instrument created to permit the owner to issue bonds for its own purposes, and an entity which does not seem to come within any definition of person, partnership, corporation, or association, contained in the Revenue Act of 1918.

The warrants that were issued by the four districts in 1919 preliminary to the issuance of the bonds in 1920, were delivered by the districts to the taxpayer, but they were the deliverance of "contracts in writing for the payment of money," Pol. Code, sec. 3457, for which the taxpayer's land alone was security and on which there was no other liability or security. Neither the State nor the respective counties had any concern in this transaction. There was only one person interested and that was the taxpayer, and it knew that if it did not redeem the contracts to pay its lands would be sold to procure the funds to make payment. The issuance of the warrants was its transaction and made on its order by its employees, who were trustees of the districts. There was no way and no source from which these warrants could be paid except from the treasury of the taxpayer. No lien was created upon the reclamation works of the district, which could not be disposed of by the trustees except to the extent to which they became unnecessary, and then any funds realized would be distributed to the landowners. We conclude, under these circumstances, that we can not consider the reclamation districts a separate entity from the taxpayer so as to permit the taxation as income to the taxpayer of any part of the warrants

issued. See *Southern Pacific Co.* v. *Lowe*, 247 U. S. 330, 337; *Gulf Oil Corporation* v. *Llewellyn*, 248 U. S. 71.

The second proposition of the taxpayer involves the question as to whether the excess in value of the warrants delivered to the taxpayer over the cost of the reclamation works as determined by the Commissioner constitutes income to the taxpayer and is, therefore, taxable. Much of what we have said in discussing the first proposition applies to the second, and need not here be repeated.

When the procedure outlined in paragraph 6 of the findings of fact was completed, what did the taxpayer have? What was there that was taxable as income? It had discharged its indebtedness of $1,598,500 and had in its place an indebtedness of $1,700,000. Of its former debt, $1,193,500 was secured by mortgage on its lands. Under the change in condition, the entire amount of $1,700,000 was secured by a statutory lien upon its lands. For every dollar the taxpayer received in warrants an absolute valid lien was placed upon its real estate. The taxpayer had secured an extension of its indebtedness, but in some respects was in a worse condition than before, because its debt was larger and its lands were subject to sale for the purpose of paying interest or principal, without formality of foreclosure proceedings. In view of all that has been said, we can only decide that the transactions outlined resulted in the substitution of one debt for another, without any realized gain to the taxpayer.

In considering this appeal, we have limited our discussion and decision to the peculiar facts involved. What the situation would be were there other owners whose lands as well as those of the taxpayer were involved and who were assessed for the payment of bonds issued for the purchase of rights of way or reclamation works installed by the taxpayer, we are not called upon to consider in this appeal. This taxpayer has received nothing except bonds which are a lien exclusively upon its own land, and the possibility of collecting a part of such bonds from others than itself does not exist.

The taxpayer's third proposition is that the March 1, 1913, value of the reclamation works, being greater than cost, the fair market value on March 1, 1913, of the property transferred in 1919 must be the basis for determining taxable gain or loss. This proposition is predicated upon the adverse decision of its two prior ones. These having been decided in its favor, it is unnecessary to consider the last issue.

That part of the deficiency asserted by the Commissioner upon the basis that the delivery of the warrants to the taxpayer constituted income is disapproved.

JAMES, STERNHAGEN, and GREEN dissenting.