COMMISSIONER OF INTERNAL REVENUE v. BIRCH RANCH & OIL CO.

No. 12639.

United States Court of Appeals
Ninth Circuit.

Nov. 19, 1951.

---

Theron Lamar Caudle, Asst. Atty. Gen., Ellis N. Slack, A. F. Prescott, Melva M. Graney and Irving Axelrad, Sp. Assts. to Atty. Gen., for petitioner.

George Acret, Los Angeles, Cal., for respondent.

Before BONE and POPE, Circuit Judges, and FEE, District Judge.

POPE, Circuit Judge.

The Tax Court held that the respondent taxpayer-corporation was entitled to deduct payments made by it to a California reclamation district, upon assessment calls for sums required for district bond interest charges, and thus compute a net operating loss for fiscal year 1944. If such loss existed, it is conceded that it may constitute a carry-back deduction for fiscal 1942, the year for which a deficiency had been determined by the Commissioner.

Upon this petition for review, the Commissioner contends that under the circumstances presented here, the payment was not deductible under § 23(c) (1) (E) of the Internal Revenue Code as "taxes paid",[1] as the Tax Court held. The Commissioner further contends that although the sum here in dispute was "simply a payment of interest", it is not deductible as interest because of the "economic identity" between the paying corporation and the ultimate recipients of the greater portion of the sums paid, and because, as interest, it was paid on indebtedness incurred to carry tax-exempt securities, within the meaning of § 23(b).[2]

In 1918, the so-called Conaway Ranch, in Yolo County, California, was owned by the Birch Oil Company, a partnership composed of Birch, his wife, Mr. and Mrs. Conaway, parents of Mrs. Birch, and the Hopkins sisters, nieces of Birch. For the purpose of reclaiming and developing the lands in the ranch, the owners petitioned the Board of Supervisors of the county for the creation of a reclamation district. In April, 1919, the Board approved the establishment of Reclamation District No. 2035, comprising approximately 21,000 acres. It included all but 1300 acres of the Conaway Ranch, and eight parcels of land owned by others. (By 1925 Birch acquired seven of these eight separate parcels, adding them to the Conaway Ranch. The eighth parcel, not acquired, consisted of 240 acres.)

Trustees were named for the newly created district, who procured plans and estimates for the contemplated improvements, estimated to cost $2,264,740. Upon due approval of the plans, the value of the anticipated benefits was assessed and apportioned to the lands, and assessment lists approved and filed.

The Birch Oil Company, under the direction of the district's engineer, built the improvements called for in the plans, and financed the costs, slightly more than two million dollars. Upon completion of the work in January, 1925, it received a district warrant for $2,000,000.

The district then offered at auction 2000 bonds each of the par value of $1,000. Birch, acting for himself, his wife, and the

1. "§ 23. Deductions from gross income. In computing net income there shall be allowed as deductions:

   *     *     *     *     *     *

"(c) Taxes generally. * * * Taxes paid or accrued within the taxable year, except—

   *     *     *     *     *     *

"(E) Taxes assessed against local benefits of a kind tending to increase the value of the property assessed; but this paragraph shall not exclude the allowance as a deduction of so much of such taxes as is properly allocable to maintenance or interest charges". 26 U.S. C.A. § 23(c) (1) (E).

2. "(b) Interest. All interest paid or accrued within the taxable year on indebtedness, except on indebtedness incurred or continued to purchase or carry obligations (other than obligations of the United States issued after September 24, 1917, and originally subscribed for by the taxpayer) the interest upon which is wholly exempt from the taxes imposed by this chapter."

Conaways (the Hopkins sisters had sold out to Birch and Mrs. Birch in 1924), purchased all the bonds, giving the $2,000,000 warrant in payment.

Upon receipt of the bonds, Birch delivered $786,000 par value of such bonds to the Hopkins sisters. This was pursuant to the terms of the contract by which Birch and wife arranged to make their purchase of the Hopkins sisters' interest in the ranch, as mentioned in the preceding paragraph. The arrangement, made in 1924, was that when the bonds were issued, 786 of them would be delivered to the Hopkins sisters. At the same time Birch and his wife agreed to purchase these bonds at face, payments to be made in installments of bonds and of cash over a period of years. The following year, 1926, Birch bought out the Conaways' interest in the ranch.

By 1934 Birch and his wife had completed purchase from the Hopkins sisters of 476 of their bonds. Thus the Hopkins sisters then retained 310 bonds. The Birches had sold Lulu Minter, a cousin of Birch, 10 bonds, and 86 were sold to a life insurance company of which Birch was president.

Then, on October 15, 1934, the taxpayer-corporation was organized by Birch and wife. The same day they organized Birch Securities Company and Birch Holding Company. They transferred to the taxpayer-corporation the ranch and certain other property. To the Securities Company they transferred their remaining 1594 bonds (2000, less 310 in Hopkins, 10 in Minter, and 86 in the insurance company.). All shares of the taxpayer-corporation and of the Birch Securities Company were transferred to Birch Holding Company, which issued 49 per cent of its shares to Birch and 51 per cent to Mrs. Birch.

Although the bonds of the reclamation district, as issued, were to mature beginning January 1, 1935, and serially thereafter until the last became due January 1, 1943,

nothing was paid on principal, and in 1935 the original issue was refunded by issuance of 2,000 new bonds of $1000 face value. The new, like the old, bore interest at six per cent per annum, payable January and July first of each year. The refunding bonds were to mature serially beginning January 1, 1945.

After each issue of bonds, both original and refunding, actions were instituted as provided by California law, for the purpose of procuring an adjudication of their validity, and in those actions decrees adjudging the bonds the valid and legal obligations of the district were entered.

In order to provide the funds necessary to permit the district to pay interest on the bonds, various procedures were adopted. For the first six years, 1925 to 1931, the full amounts of the bond interest were paid on the treasurer's calls. This permitted the Hopkins sisters to cash their coupons, and Birch and wife "received back" the interest on their bonds from the treasurer. The amounts thus received by them was not accounted for as part of their income, as they claimed it as tax exempt, although they took deductions for the amounts paid the treasurer; and although this claim was questioned every year, it was never disapproved. From 1931 to 1934, Birch and wife purchased each year, at face value, the coupons then coming due on the Hopkins bonds and turned them in to the treasurer.[3]

The record is not clear as to how the interest on the bonds was provided immediately after the taxpayer-corporation was formed in 1934, but from 1937 to 1943 it was hard up, and short of funds. The county treasurer, who was the district treasurer, knew this situation and was lenient and made no calls for payments. But the corporation continued to buy at face value the maturing interest coupons on the 310 bonds of the Hopkins sisters and the 10 bonds of Minter, paying $18,600 and $600 a year respectively, for them.[4] No interest

3. The California law permitted payment of sums due the treasurer by delivery of coupons. Calif. Political Code, § 3480, p. 243 of Bancroft-Whitney's 1944 compilation.
4. For 1937 and 1939, the taxpayer-cor-

poration accrued on its books and deducted on its income tax returns $120,000 a year, for which a call could have been made, to provide six percent on the $2,000,000 bonds outstanding. This was disallowed. On contest of the dis-

was paid on the 86 bonds held by the insurance company, and in 1940, the taxpayer-corporation bought those bonds from the insurance company.

During this period of hard times for the taxpayer-corporation, Mr. and Mrs. Birch were also unable to carry out their agreement to take over the remaining 310 bonds of the Hopkins sisters, who continued to hold them until after the beginning of the fiscal year here in question (October 1, 1943, to September 30, 1944).

Thus, at the beginning of fiscal 1944, the taxpayer-corporation held 86 of the district bonds, Lulu Minter had 10, the Hopkins sisters, 310, and Birch Securities Company [5] held the remaining 1594.

Since its organization the taxpayer-corporation has operated and maintained the reclamation district improvements,— the district, as such, has expended nothing for its operation or maintenance. Such costs have been borne and paid for by the taxpayer-corporation, which has treated such disbursements as part of its expenses of operating the ranch.

Late in 1943, the taxpayer-corporation came into funds, and shortly after the beginning of the fiscal year here in question, that is, fiscal 1944, and on October 13, 1943, the treasurer made a call for $58,565.92. This was paid December 28, 1943. Thereafter other calls were made, and paid, during the fiscal year, the total thus paid being $221,610.87. Following each of these collections the treasurer paid interest on the bonds.

On March 15, 1944, Birch and his wife bought the remaining 310 bonds held by the Hopkins sisters. Thus at the end of fiscal 1944 the 2000 bonds were distributed as follows: Birch Holding Company, 1594; Birch and wife, 310; the taxpayer-corporation, 86; and Lulu Minter, 10.

In its return for the fiscal year ending September 30, 1944, the taxpayer corporation claimed deduction for sums paid the reclamation district as taxes. The revenue agent in charge, in a report addressed to the taxpayer-corporation, disallowed deduction of the $221,610.87 on the ground that "there was no real or actual obligation outstanding against the taxpayer, since Reclamation District No. 2035 was comprised exclusively of the taxpayer's property, and since A. Otis Birch and his wife, Estelle Birch, the sole stockholders of the Birch Ranch and Oil Company hold substantially all the bonds of the Reclamation District. * * As the interest received by A. Otis Birch and his wife, Estelle Birch, is nontaxable, the amounts claimed as taxes paid by the Birch Ranch and Oil Company is considered non-deductible."

The Tax Court held the taxpayer-corporation entitled to a "taxes paid" deduction for the $221,610.87 under § 23(c) of the Internal Revenue Code,[6] and that in consequence the corporation had a net operating loss which it may carry back and deduct in 1942.

The Commissioner takes the position that the $221,610.87 was not "taxes paid" under § 23(c) (1) (E). The permission in subdivision (E) to deduct sums "allocable to * * * interest charges", refers, it is said, to "such taxes", by which is meant "taxes assessed against local benefits".[7] The Commissioner says that the assessments here were not of that kind, for the then owners of the Conaway ranch themselves built the improvements, and financed them. Here it is said, because the owner financed the improvements, and had already paid for them before the bonds were issued, the assessment was not one for local benefits. The Commissioner argues that the section referred only to the usual case where bonds are sold to provide funds to pay for im-

---

allowance, the Tax Court held the $18,-600 paid the Hopkins sisters, as well as the $600 paid Lulu Minter was deductible, but sustained disallowance of the rest on the ground that taxpayer kept its books on a cash, not an accrual basis. This court affirmed in Birch Ranch and Oil Co. v. Commissioner, 152 F.2d 874.

5. Birch Securities Company was liquidated and dissolved before the end of the fiscal year, whereupon these 1594 bonds passed to Birch Holding Company.

6. Quoted in footnote 1, supra.

7. See (E) under footnote 1, supra.

provements constructed by or for the district, and where the "tax" consists of an enforced contribution toward the cost of improvement.

The Commissioner says that these bonds were not used for the purposes common to most special improvement districts, but rather as a personal, private convenience of the owners of the ranch. Mr. and Mrs. Birch arranged to buy the Hopkins sisters' interest in the ranch, for a purchase price of $787,000. Instead of giving their notes secured by mortgage for that amount, they secured the Hopkins sisters by delivery of bonds,[8] with their agreement to repurchase the bonds at par. That they were regarded merely as evidence of a personal obligation is evidenced, it is said, by the fact that no amount to discharge the bonds was ever paid to the treasurer. The amounts payable to the Hopkins sisters, both of principal and interest, were, except for the first six years, paid direct to these sisters.

The result of all this, in the view of the Commissioner, is that the total payment must be regarded as a payment of interest, and not of taxes. Once it is conceded to be interest, the Commissioner says, other provisions of the Internal Revenue Code, hereafter referred to, make most of such interest not deductible.

We cannot agree that the $221,610.87 was not "taxes paid". Although the manner of constructing the improvements and issuing the bonds was unusual, it is apparent, and not disputed, that the California law permitted what was here done, and the California court adjudged the bonds the valid and legal obligations of the district.

As for the fact that the ranch owners built the improvements, it is noted that such was done under the direction of the district's engineer. Had the trustees proceeded in a more usual manner, and called for bids for the construction, we know of nothing to prevent the ranch owners from bidding and taking such a contract, or from accepting the bonds in payment. The result in such case would not be, in any matter of substance, different from what came about here.

Since the district met the requirements of California law, its status as a district entity, not to be confused with the owners of the ranch, or the taxpayer-corporation, cannot be questioned regardless of the fact that the district served but a single ranch, (plus one 240 acre parcel). The western states have long considered that the reclamation, even of a single parcel of land in a single ownership, may justify the exercise of sovereign powers. Cf. Clark v. Nash, 198 U.S. 361, 25 S.Ct. 676, 49 L.Ed. 1085. Here the power afforded is that of taxation.

The Commissioner says that the payor and the payee on these bonds were economically identical. He emphasizes this point in two ways. First, he says that because of this economic identity, the district lacks reality for tax purposes. He cites Rindge Land & Navigation Co. v. Commissioner, 2 B.T.A. 1179, dealing with a California reclamation district, in which it was said: "Where there is but one landowner, as in this appeal, a reclamation district is nothing more than a legal fiction— an instrument created to permit the owner to issue bonds for its own purposes."

His second point with respect to the claimed fact that the payor and payee were economically identical is predicated upon his assumption that the $221,610.87 is to be treated as a payment of interest. So regarded, the Commissioner says, the part paid over and above the portions which went to the Hopkins sisters, and to Lulu Minter, cannot be a deduction here, citing Prudence Securities Corp. v. Commissioner of Internal Revenue, 2 Cir., 135 F.2d 340, as holding that no deduction is allowable for interest paid when payor and payee are economically identical.

We think the facts here do not call for a determination that the taxpayer corporation or the reclamation district lack reality, or that they and the bondholders must be regarded as a single economic interest, or that any corporate fiction must be disregarded. The record shows that the taxpayer-corporation was created for a substantial business purpose,—to facilitate the securing of

8. The Hopkins sisters received 786 bonds plus $1,000 cash.

needed bank credit for the ranch operations. The reclamation district, as formed, contained eight other parcels of land besides the Conaway ranch, and although seven of these eight were later acquired and added to the ranch, yet at that time, and at all times until after the middle of the fiscal year in question, a substantial number of bonds were owned and held by persons other than those holding the taxpayer's stock. We think these circumstances sufficiently show that the ranch, the district, and the bondholders were not, either from a legal or an economic point of view, identical.

What has happened here is that the affairs of the ranch, its owners, and the district have been so handled that the district is substantially coterminous with the ranch, and the owners of the ranch became the holders of the greater portion of the bonds. Since local law permits this, we perceive no reason for denying application of the statutory authority for deduction of the sums paid on calls pursuant to district assessments as "taxes paid". If the district were made up of, say, eight separate parcels, of substantially equal size, in eight ownerships, it would be hard to find any reason why four of the owners might not each purchase one eighth of the district bonds, without thereby losing their "taxes paid" deductions. We perceive no reason why the situation of this taxpayer should be any different. We think that the rather unorthodox manner in which the district operation and maintenance was provided for, as part of the operations of the ranch itself, does not call for any different result. It was no more than a commonsense method of saving bookkeeping and paper work.

What we have thus far said makes it unnecessary to consider at length the other points urged for reversal of the Tax Court decision. Proceeding upon the assumption that we might hold that the sum allowed as a deduction was paid, not as taxes, but as interest, the Commissioner urges that it could not be deducted as "interest paid", because it was paid "on indebtedness incurred or continued to purchase or carry obligations * * * the interest upon which is wholly exempt from the taxes imposed by this chapter", within the meaning of § 23(b),[9] as carried into § 122(d) (2).[10]

The Commissioner seems to recognize that if we hold, as we do, that the deduction allowed here was of "taxes paid", that the provisions of § 122(d) (2) would not be applicable. But he argues that the general purpose of that section was to insure that only economic losses would be taken into account in computing net operating loss for carry-back purposes. He says that the effect of permitting a tax deduction here is to allow a deduction which is not an economic loss, and that therefore the payment here in question "should be treated" as interest, so that the purposes behind § 122(d) (2) could be effectuated here.

We think that such a process would take us beyond our jurisdiction, which does not include legislation. Nor, in any event, do we think the situation of this taxpayer was like that for which the exception in § 23(b) was devised, namely, the prevention of tax avoidance by the purchase with borrowed money of tax exempt securities. Refer to Denman v. Slayton, 282 U.S. 514, at page 519, 51 S.Ct. 269, 75 L.Ed. 500. The basic idea behind § 122(d) (2) was undoubtedly the same. The fortuitous result of what happened here presents a different situation and one which would not, we think, warrant such a bending of the statutory provisions as we are asked to make.

9. See footnote 2, supra.

10. "§ 122. Net operating loss deduction.
   *     *     *     *     *     *
   "(b) Amount of carry-back and carry-over.
   *     *     *     *     *     *
   "(d) Exceptions, additions and limitations. The exceptions, additions, and limitations referred to in subsections (a), (b), and (c) shall be as follows:
   *     *     *     *     *     *

"(2) There shall be included in computing gross income the amount of interest received which is wholly exempt from the taxes imposed by this chapter, decreased by the amount of interest paid or accrued which is not allowed as a deduction by section 23(b), relating to interest on indebtedness incurred or continued to purchase or carry certain tax-exempt obligations". 26 U.S.C.A. § 122 (d) (2).

930

The judgment of the Tax Court is affirmed.

JAMES ALGER FEE, District Judge.

I concur.

The policy of the State of California to promote reclamation of arid land is reflected in the provisions which levy taxes to cover the cost of such benefits to the public, together with maintenance and interest charges. Sec. 23 specifically permits deduction of sums paid for "taxes." As Judge Pope's able opinion shows, no other questions are involved.