EFFIE JONES BICKEL and COMMERCE TRUST COMPANY, a Corporation, Executors Under the Will of A. BICKEL, Appellants, v. ARGYLE INVESTMENT COMPANY, a Corporation, E. SHUKERT, and COMMERCE TRUST COMPANY, a Corporation.—121 S. W. (2d) 803.

Division One, November 19, 1938.

*Watson, Ess, Groner, Barnett & Whittaker* for appellants.

458

*Ringolsky, Boatright & Jacobs* for respondents.

BRADLEY, C.—This cause has been recently reassigned. Plaintiffs sought a judgment against defendants for $15,225.27, plus interest at six per cent from January 15, 1926, and sought to have the judgment declared a mechanic's lien on the real estate described, and to be superior to the lien of a deed of trust in which defendant, Commerce Trust Company, is trustee.

The cause was referred, and the referee found for defendants. Plaintiffs filed exceptions to the report of the referee. These were overruled, the report confirmed, and final judgment entered in favor of defendants. After the usual steps, plaintiffs appealed.

A. Bickel, deceased, filed this cause August 19, 1926. Bickel died April 29, 1930, and the cause was revived December 11, 1930, in the name of the executors under his will. The cause is based on a written contract executed December 8, 1924, between Bickel, operating under the name of The Bickel Contracting Company as first party and defendants, Argyle Investment Company and Shukert, as the second party.

Defendants, Argyle Investment Company and Shukert, contemplated adding six stories to the then four story Argyle building at Twelfth and McGee streets, in Kansas City, Missouri, and the contract concerned the addition of the six stories. The contract recited that defendants, Argyle Investment Company and Shukert, proposed to construct the six stories "in accordance with preliminary plans and sketch elevation, both of which are herewith submitted and approved, and specifications covering details which are hereto attached,"

and that first party (Bickel) "shall, from this date and until such time as the above mentioned improvements shall have been fully completed and paid for, act as agent" for the Argyle Investment Company and Shukert, "and give such time, attention and personal service as may be required in connection with arranging for and executing the contract work involved in the erection and completion of said improvements, and in and about said work shall perform all of the duties and services ordinarily performed by and expected of a general contractor."

The contract provided, among other things, that Bickel was to furnish architectural service and certain stenographic service, and was to receive $30,000 "as a fee" for the services performed by him. The contract recites that Bickel estimated that the cost of the improvement would be $285,000 and that he guaranteed that "the cost will not exceed that sum," and agreed that if the cost exceeded that sum, he would pay on such excess a sum not to exceed $15,000. The contract also provided that if the cost was less than $285,000, then Bickel was to have, in addition to the $30,000 fee, "one-half of such saving."

April 15, 1925, the parties entered into what was termed an "addenda to contract for loft building." The addenda concerned "the construction of tenant partitions which are not included in loft building estimate or fee." Compensation for looking after the construction of the tenant partitions was to be "cost plus ten per cent."

The cause is based on the contention that the construction of the six stories, called the loft building, exclusive of the work called for in the addenda, was $30,450.54 less than $285,000, and that, under the contract, Bickel was entitled to recover a judgment for $15,225.27, one-half of the alleged saving, and was entitled to have the judgment declared a mechanic's lien on the described premises, and superior to the lien of the deed of trust mentioned.

As stated, the cause was filed August 19, 1926. At the September Term, 1926, defendant, Commerce Trust Company, as trustee in the deed of trust, filed answer, alleging that the deed of trust given by the Argyle Investment Company to it as trustee, on December 1, 1924, was to secure a bond issue of $600,000; that the indebtedness secured by the deed of trust was unpaid; and that the lien of the deed of trust was superior to any claim by Bickel. The answer denied generally other allegations of the petition. Defendants, Argyle Investment Company and Shukert, filed general denials at the September Term, 1926. Nothing further appears to have been done until October 16, 1928, when Hon. John D. Wendorff, a member of the Kansas City Bar, was appointed referee by agreement. As stated, Bickel died April 29, 1930, and the cause was revived in the name of his executors, December 11, 1930, and on April 3, 1931, the referee

was reappointed. Bickel's will was probated in the probate court of Jackson County, Missouri, May 3, 1930, and letters issued on that date to the executors, plaintiffs after revival. Notice of letters of administration was duly published within 10 days of date of issue. May 20, 1931, defendants, Argyle Investment Company and Shukert, filed what is termed amended separate answer and cross-petition.

The amended answer alleged that Bickel was negligent in the discharge of his duties, and that as a result defendants, Argyle Investment Company and Shukert, sustained and suffered damages far in excess of the amount claimed by Bickel. The items of alleged damage are set out at length in the amended answer, and total $43,004.20. Also the amended answer alleged that Bickel was not entitled to the $30,000 fee paid to him. An accounting was asked; also a judgment over was asked against the executors as such ''for the amount found to be due on account of such damages, credits, and over payments.'' The claim for judgment over was abandoned, and the alleged damages were invoked only to defeat Bickel's claim for the $15,225.27 and interest.

For reply (filed June 2, 1931) to the amended answer plaintiffs filed general denial, and then alleged that defendants were served with process August 19, 1926, and that at the September Term, 1926, each of the defendants filed general denials for answers, and alleged further, among other things, that defendants, Argyle Investment Company and Shukert, were barred by the one-year Statute (Sec. 183, R. S. 1929) of Limitations relative to exhibiting demands against the estates of deceased persons.

The referee filed his report May 26, 1934, and plaintiffs filed exceptions on May 29, 1934. It appears that the chief items of alleged damage claimed by defendants, Argyle Investment Company and Shukert, were based on alleged defective plumbing and on an inadequate heating system installed under the supervision of Bickel, in the Argyle building. These were installed by McKinley Plumbing & Heating Company. August 15, 1927, the McKinley company filed suit against defendant, Shukert, to recover $6693.52, a balance claimed on plumbing and heating work at the Shukert building, Twenty-sixth Street and Grand Avenue, Kansas City, Missouri. February 25, 1928, the McKinley company filed suit against defendants, Argyle Investment Company and Shukert, to recover $7429.17, a balance claimed on plumbing and heating work at the Argyle building. The McKinley company was adjudged a bankrupt before either of these cases was tried, and afterwards both suits were settled by payment of $4500 to the trustee of the bankrupt estate of the McKinley company. December 29, 1934, and after the referee had filed his report, and after exceptions thereto were filed, and after the cause was

argued, plaintiffs sought to reopen the case for the purpose of introducing evidence as to the two suits by the McKinley company, claiming that, in settling the two suits, the *very* claims pleaded as a defense in the amended answer were *settled* by the payment of the $4500, but motion to reopen was refused. Plaintiffs then offered in evidence part of the files in the circuit court and in the bankruptcy case, pertaining to these two suits, but the offerings were refused.

It is conceded, in effect, that plaintiffs are entitled to recover if defendants, Argyle Investment Company and Shukert cannot defeat the Bickel claim on the defense set up in the amended answer.

These questions are presented: (1) Was Bickel responsible, under his contract and the evidence, for any damages that defendants, Argyle Investment Company and Shukert, may have sustained by reason of defective work or material connected with the plumbing and heating installation by the McKinley company? (2) Are defendants, Argyle Investment Company and Shukert, barred by laches from relying upon the defense alleged in the amended answer? and (3) Did the trial court abuse its discretion in refusing to reopen the case to permit the introduction of evidence relative to the two McKinley company suits?

Hereinafter, when we use the term defendants, we have reference to defendants, Argyle Investment Company and Shukert.

Was Bickel responsible, under his contract, for any damages that defendants may have sustained by reason of defective work or material connected with the plumbing and heating installation by the McKinley company? It appears from the evidence of Hal C. Brent, defendants' witness, son-in-law of Shukert and secretary-treasurer of defendant, Argyle Investment Company, that the McKinley company, since about 1903, had "taken care of, done all of Mr. Shukert's plumbing and steam heating work," and that defendants desired that this company do such work in the proposed addition to the Argyle building; that defendants "made it very plain" to Bickel that the McKinley company was "to have this work on this building, on the Argyle building." Also, it appears from the evidence of Brent that he called to Bickel's attention that the McKinley company was not installing a sufficient heating system, and that Bickel told him to see Mr. McKinley; that he saw McKinley, and that McKinley said that "we will put in a larger—we will put in a whole unit;" and that he (Brent) told McKinley "that will not do."

The referee found that "before the plumbing and heating contractor (McKinley) started to work, he informed Benjamin Natkin, a practicing engineer for heating plants in Kansas City, of the plan for heating the six additional stories, and was advised by Natkin that same was impractical and would not work; . . . that

after the work was completed, Brent called Natkin to investigate the work; that Natkin found the system was impractical and would not work; that 'different kind of (heating) system was used on the six upper floors from the system already in the lower four floors.' He also found the return pipes were too small and the steam supply pipes were too little. Traps, absolutely essential to proper operation of the system, had been omitted on the return pipes. The oil burners and boilers in the basement were inadequate even to supply a sufficient amount of steam to properly heat the building. To correct the system, traps were installed for each of the radiators, larger sizes of pipes and steam risers were substituted for some of the smaller pipe, and the entire system was balanced. Large size Kewanee boilers were installed at a necessarily lower level, in place of cast iron boilers. Cast iron boilers were impractical in large buildings, and the substitution of Kewanee boilers was essential. I also find that J. M. Arthur, Jr., superintendent for the Kansas City Power & Light Company, investigated the plant in the spring of 1927. He further testified that the boilers were 'atrocities' and the completed job was a 'conglomeration,' and I find that the system for the first four floors and the upper six floors was not 'uniform.' I find the facts to be, as he testified, that there were 'bad piping connections.' He fully corroborated the findings of Mr. Natkin. H. C. Henrici, an engineer, investigated the work in 1926, immediately after its completion. He found, and I find the facts to be as he testified, that the boilers had been cracking, sections falling, certain portions of the building were not getting heat, and enormous pressure was required to get steam to various parts of the building. The first four floors were heated by an air line system and the upper six floors by a two pipe gravity system—radically different kinds of systems.''

In the referee's report it is stated that Bickel claimed that ''the troubles (as to plumbing and heating) did not exist, but that they were defendants' own fault due to failure to operate properly.'' The referee found that such claim was unfounded. After reviewing the evidence, the referee on the question of Bickel's liability, closed the subject as follows:

''The inquiry now becomes pertinent, as to whether Bickel is chargeable with any default in the performance of his agreed services, in connection with McKinley's failure to properly install the heating and plumbing systems—for Bickel was not to install them himself. He was only to arrange for same and to perform the necessary service in the execution of what he had arranged, just as a general contractor would. I find the facts to be as follows: The record convicts Bickel of the grossest neglect of an inattention (attention) to his duties. So far as this record shows, though defendants' agent, he discovered none of the defects complained of, but shut his eyes to all of same.

He accepted McKinley's work as satisfactory. He took no steps to remedy or correct the situation. Though no one would think of arranging and letting a plumbing and heating contract without plans and specifications therefor (and there was much evidence to this effect), Bickel so let these contracts to McKinley. Bickel, himself, was away on the Bagnell Dam most of the time while construction work (at the Argyle building) was in progress. It is obvious that if Bickel had exacted from McKinley, what any general contractor would have required of a subcontractor, he would himself have condemned McKinley's work as inadequate, unskillful and insufficient, and would never have approved same, but would, on the other hand, have compelled McKinley to make all of the changes and corrections eventually made, or to have installed same properly in the first place. Had he (Bickel) been efficiently performing his duties, he would have discovered cold radiators, leaking toilets, open vents on the fourth floor ceiling, patch work systems, small pipes where larger ones were required. Indeed, if such existed, he would have discovered and corrected missing 'orifices' and saved his principals thousands of dollars. . . . He was the man charged, in defendants' behalf, to protect their interests. Obviously he was, instead, dealing at arms' length with them, to collect as great a commission as possible. He ignored the fiduciary relationship existing between them. What defendants discovered, Bickel should have discovered. What defendants did, Bickel should have required McKinley to do.''

We find nothing in the contract, or in the evidence to support the contention that Bickel was not liable for the defective work done by the McKinley company. The referee and the trial court so found, and we agree.

■ Are defendants barred by laches? As appears above this cause was filed August 19, 1926, and that at the September Term (1926) of the court, defendants answered by a general· denial; and that amended answer setting up the defense of defective plumbing and heating was not filed until May 20, 1931, a year and twenty-one days after Bickel's death (April 29, 1930). Plaintiffs say in their brief that at the time this cause was filed defendants were in possession of all the facts (and they were), and that had they not delayed nearly five years, and until after Bickel's death to bring forward their defense, Bickel ''could have assembled· the evidence to defeat those claims;'' that ''the conduct of defendants in delaying the assertion of the affirmative matter contained in their amended answer nearly five years and until after Bickel's death, had the effect of depriving Bickel and these appellants of assembling the evidence with which to defeat those claims, and to permit those claims to be asserted affirmatively for the first time after Bickel's death and nearly

five years after the institution of this suit, is contrary to the policy of the law,'' and that defendants are barred by laches.

It appears that during the taking of evidence before the referee, Bickel (then represented by counsel other than here) regarded the cause as one at law, while defendants, the referee and the trial court, regarded the cause as one in equity. Regardless of Bickel's contention, during the trial, that the cause was at law, his theory was not adopted, and he had to proceed as though in an equity forum, and we so proceed (without deciding) as though the cause is on the equity side of the court. Defendants make the point that laches was not pleaded, and, therefore, not in the case. The time that elapsed from the filing of the petition until the filing of the amended answer is shown by the pleadings and the record proper. No objection, on the ground that laches was not pleaded, was made to the evidence showing delay. In the situation we think the question of laches should be considered. [Ilgenfritz v. Mo. Power & Light Co., 340 Mo. 648, 101 S. W. (2d) 723, l. c. 726, and cases there cited.]

Laches ''cannot be invoked to defeat justice, and it will be applied only where the enforcement of the right asserted would work injustice.'' [21 C. J., sec. 212, p. 214.] ''The defense that a claim is stale is purely an equitable one, and unless there is some natural justice back of it a court of equity will not entertain it.'' [Bucher v. Hohl et al., 199 Mo. 320, l. c. 330, 97 S. W. 922.] Before laches can be invoked, ''the delay must have been such as practically to preclude the court from arriving at a safe conclusion as to the truth of the matters in controversy, and thus make the doing of equity either doubtful or impossible.'' [21 C. J., sec. 219, p. 223.] Mere lapse of time is not sufficient to support laches. [Lindell Real Estate Co. v. Lindell et al., 142 Mo. 61, 43 S. W. 368.]

Plaintiffs say that they were at a disadvantage because of Bickel's death. The record shows that McKinley, as a witness for plaintiffs, testified at length. McKinley's evidence covers about 225 pages of a 1130 page record. He vigorously maintained that there was nothing wrong with the plumbing and the heating. Likely no one was more familiar with the work the McKinley company did than McKinley himself. We are quite clear that plaintiffs had no just ground to complain on laches, and that defendants' defense was not barred by laches.

Did the court abuse its discretion in refusing to reopen the case to permit the introduction of evidence relative to the two McKinley company suits and their settlement? The record shows that plaintiffs knew about the McKinley Company suits at least two years before the motion to reopen was filed. However, present counsel for plaintiffs did not come into the case until July, 1934, and it appears that present counsel for plaintiffs, after coming into the case, had

sought to locate the circuit court files of the two McKinley suits, but were not successful until about ten days before the motion to reopen was filed (December 29, 1934). It also appears that counsel for defendants had these files, and that there was no receipt for them in the office of the circuit court clerk. Counsel for defendants, however, say that the files were receipted for by them, and this is true so far as appears here. There is no claim that counsel for defendants sought to conceal these files. It appears that counsel for plaintiffs, during their search for the files, did not make inquiry of counsel who had the files until about ten days before the motion to reopen was filed.

Counsel for defendants resisted reopening the case, claiming that the showing as to the two McKinley company suits did not justify reopening. It appears that if the case had been reopened it would have been necessary, according to defendants' counsel, to refer it back to the referee, and that the additional evidence would have been rather extensive.

During the hearing on the motion to reopen the court said: "I am making a statement of the *status* of the case since it reached me on this hearing on the referee's report. There seemed to be no disposition at all on the part of either attorney at the time it came before me to introduce further testimony. They had a voluminous record and they both thought the matter was concluded, except upon the question of confirming the report or not. Now I feel disinclined to reopen this case. It is practically reopening it extensively."

"The reopening of a case after both sides have closed to permit the introduction of other testimony is a matter largely within the discretion of the trial court, and unless it appears that such discretion has been abused in that injury has resulted therefrom to the party complaining it will not be interfered with." [Buck v. St. Louis Union Trust Co. et al., 267 Mo. 644, 185 S. W. 208, l. c. 213, and cases there cited.]

The offerings made by plaintiffs on the motion to reopen do not disclose that, in settling the McKinley company suits, defendants *settled* for the matters and things set up in the amended answer. It appears that both suits were settled by paying $4500. The McKinley suit against Shukert to recover $6693.52, concededly did not concern the Argyle building, and there is no showing what part of the $4500, if any, was considered as applying in the suit concerning plumbing and heating work in the Argyle building. There was no counterclaim filed in either of these cases. The answer in each was a general denial. In a deposition of Shukert, taken in the $6693.52 suit against Shukert only, it appears that Shukert contemplated filing a counterclaim, but such was not filed. However, this suit, as stated, did not

concern work at the Argyle building, but concerned work at the Shukert building.

·The trustee of the bankrupt estate of the McKinley company executed a release as to the two McKinley company suits on payment of the $4500. This receipt is to the effect that the two suits and "all other controversies" so far as the trustee was concerned, were settled.

On the hearing of the motion to reopen, the court remarked upon the length of time this cause had been pending (from August 19, 1926, to December 29, 1934). We do not think that the trial court abused its discretion in overruling the motion to reopen.

In the reply to the amended answer plaintiffs, as appears, supra, pleaded that the defenses set up in the amended answer were barred under Section 183, Revised Statutes 1929, because no demand was exhibited against the estate of Bickel, deceased. The referee and the trial court ruled this question, but plaintiffs make no point here on that question.

The judgment should be affirmed and it is so ordered. *Ferguson* and *Hyde, CC.,* concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.