ELIZABETH LEWIS SAIGH, TRANSFEREE, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 63355, 63352–63354, 63356–63359.  Filed May 25, 1961.

---

[1] Proceedings of the following petitioners are consolidated herewith: Estate of A. L. Watson, Deceased, Oscar G. Schaefer, Administrator, Transferee, Docket No. 63352; Irma Hannegan, Transferee, Docket No. 63353; Robert E. Hannegan Trust, Irma Hannegan and Mercantile Trust Company, Trustees, Transferee, Docket No. 63354; Fred M. Saigh, Jr., Transferee, Docket No. 63356; Sidney Salomon, Jr., Transferee, Docket No. 63357; Jean Salomon, Transferee, Docket No. 63358; Estate of R. Vernon Clark, Deceased, St. Louis Union Trust Company and Wilbur B. Jones, Co-Executors, Transferee, Docket No. 63359.

*C. Rudolf Peterson, Esq., William D. Crampton, Esq.,* and *Floyd F. Toomey, Esq.,* for the petitioners in Docket Nos. 63355 and 63356.

*Ray Eder, Esq.,* for the petitioners in Docket Nos. 63352, 63353, 63354, 63357, 63358, and 63359.

*Gilbert Weiss, Esq.,* for the petitioners in Docket Nos. 63353 and 63354.

*Douglas L. Barnes, Esq.,* and *Ivan L. Onnel, Esq.,* for the respondent.

414

OPINION.

Van Fossan, *Judge:* The first issue is whether the transfer of $2,205,000 [2] from Building Inc. to Investment on June 29, 1946, constituted a "loan," as argued by petitioners, or a distribution taxable as a dividend, as contended by respondent.

Section 115 of the Internal Revenue Code of 1939 provides as follows:

SEC. 115. DISTRIBUTIONS BY CORPORATIONS.

(a) DEFINITION OF DIVIDEND.—The term "dividend" when used in this chapter * * * means any distribution made by a corporation to its shareholders, whether in money or in other property, (1) out of its earnings or profits accumulated after February 28, 1913, or (2) out of the earnings or profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made. * * *

See sec. 29.115–1, Regs. 111.

We must determine, first, whether Investment was a "shareholder" within the meaning of the above-quoted section, and second, whether there was a "distribution" by Building Inc. "out of its earnings or profits."

In seeking the answer to the first question immediately above and considering the facts as set forth in our Findings of Fact, we start with the rule of many years' standing "that substance and not form should control in the application of Federal income tax laws." *Gregory* v. *Helvering*, 293 U.S. 465.

The essential facts are as follows:

Saigh obtained an option to purchase the stock of Building Inc., the owner of the Railway Exchange Building. In its name and with the apparent acquiescence of its then shareholders, he caused Building Inc. to borrow $3 million from the Massachusetts Mutual Life Insurance Company.

On June 28, 1946, the directors of Building Inc., then in office, resigned, and in their place Saigh and associates were chosen as directors. Saigh was listed, in a waiver of notice, as possessing 19,996 of the 20,000 authorized and issued shares of Building Inc.

On June 29, 1946, the proceeds of the loan were deposited to Building Inc.'s account. Building Inc. then drew a check in the amount of $2,205,000 to the order of Investment, a corporation in which Saigh

---

[a] The deficiency notice asserted that $2,235,672.62 was transferred (including the transfer of July 1, 1946). However, on brief respondent asserts that the transfer was $2,205,000.

held all but the qualifying shares of stock. Investment in turn purchased cashier's checks and paid the former Building Inc. shareholders for their stock. Subsequently, the stock was issued in Investment's name.

Investment was not yet the record holder of the stock when the proceeds were transferred to it (which proceeds were used in the purchase of Building Inc.'s stock). Instead, Saigh was listed in the waiver as the owner. However, we are satisfied on the facts that in carrying out this plan of acquisition Saigh was acting on behalf of Investment and that Investment was the real and beneficial owner of Building Inc.'s stock and hence was a "shareholder" within the purview of section 115(a) at the time of the transfer.

We note that Saigh controlled both Investment and Building Inc. on the crucial 2 days, acting as director and president of both. Also important is the fact that Investment actually paid the purchase price, although Saigh ostensibly owned the stock, and paid this price not to Saigh but to Claude Ricketts and the Orr family, the original shareholders. In a letter written by Saigh to the attorney for the insurance company he noted that under the existing *modus operandi* Investment was to take the 20,000 shares in its name.

We also find support in the revenue agent's report, dated November 3, 1952, which was introduced in evidence and relied on by petitioners, and which reads in part as follows:

Investment Realty Company [Investment] paid $2,200,000.00 for the outstanding stock of 20,000 shares of Railway Exchange Building Inc. [Building Inc.] to two individuals by the name of Ricketts and Orr. The balance of $35,672.62 was used in the following manner. $15,000.00 went to R. Vernon Clark as a commission for help in acquiring the stock of Railway [Building Inc.] and $5,000.00 was used for organization expense. It appears that the government bonds in the amount of $15,672.62 was to be a commission to Fred Saigh. The Investment Realty Co. [Investment], however, claimed ownership of the bonds although from time to time Saigh used the bonds as collateral on certain personal loans that he made with various banks. In 1951 at time of liquidation these bonds were actually given to Saigh for services rendered in acquiring the stock of the Railway Exchange Building.

By indicating that commissions were paid by Investment to R. Vernon Clark and Saigh for obtaining Building Inc.'s stock, the report shows an agency between Saigh and Investment and that Investment was thus the principal in the transaction.

In answer to the first question, as posed above, considering the letter, the interlocking control, Saigh's prominent role, and Investment's resulting beneficial and real ownership of Building Inc.'s stock, and all other facts in the record, we hold that Investment was a "shareholder" of Building Inc. within the meaning of the statute. *Ben R. Meyer*, 45 B.T.A. 228; *William C. Baird*, 25 T.C. 387; *Elliott J. Roschuni*, 29 T.C. 1193, affd. 271 F. 2d 267 (C.A. 5).

Whether the transfer of $2,205,000 by Building Inc. to Investment was a loan or a dividend to the extent of Building Inc.'s earnings and profits, is a factual question to be determined upon consideration of all of the facts and circumstances present in the case. *Wiese* v. *Commissioner*, 93 F. 2d 921 (C.A. 8), affirming 35 B.T.A. 701, certiorari denied 304 U.S. 562. In view of the broad definition of "dividend" contained in section 115(a) and the presumption that respondent's determination is correct, petitioners have the burden of presenting sufficient facts to establish affirmatively that the transfer here in dispute falls without the section. *W. T. Wilson*, 10 T.C. 251.

The evidence before us, in essence, presents the following picture:

The disputed transfer from Building Inc. to Investment occurred on June 29, 1946. At that time nothing was said concerning the nature of the transfer. There was at that time no agreed plan of repayment, no security, no note, and accordingly no fixed time for repayment. A meeting of the interested parties was held on July 25, 1946; however, no mention was then made of the June transaction. On September 19 the directors of Building Inc. met and authorized a loan to Investment in the sum of $2,240,000, which included the amount previously transferred. On October 9 the directors of Investment met and acknowledged the indebtedness by authorizing the execution of a note payable to Building Inc. with the stock as security.

If, from the limited evidence before us, any "intention" may be discovered, it must result in the negative finding that on June 29, 1946, no "loan" was intended. Saigh testified that, in fact, he contemplated two plans, i.e., a plan of partial liquidation and a plan for a loan. We find no intimation of that fact in the corporate minutes which reflect only a plan of partial liquidation. Such is inconsistent with any intention to make a loan. The lawyer representing the insurance company thought, when the money was delivered, that a partial liquidation was to be effected by Building Inc. Testimony by others with knowledge of the matter which might serve to cast light on the affair was not produced at the hearing.

Furthermore, the acceptance of Saigh's testimony concerning the dual plans only fortifies us more firmly in the conviction that there was no intention to make a loan. The fact of having two plans and being unsure of which to adopt affirmatively dismisses the possibility that on the date of transfer there was an unconditional intention to repay on the part of the transferee (Investment) and an unconditional intention on the part of the transferor (Building Inc.) to secure repayment.

In the absence of evidence from which to find that a loan was intended or, as here, in the absence of any showing of the true intention at the time of the transaction, we are justified in relying upon the rule

promulgated in *Waldheim* v. *Commissioner*, 244 F. 2d 1 (C.A. 7), at page 5:

Under such circumstances the purpose or intent of the parties is not controlling or in absence of proof to the contrary may be assumed or found to be in accord with the actual effect of the transaction. * * *

In this instance we have the disbursement of $2,205,000 to Investment without any intimation of the nature of the transaction. Thus, we believe that we are justified in holding that Building Inc. intended to and did distribute a dividend to Investment to the extent of its earnings and profits. *Waldheim* v. *Commissioner*, *supra*.

The determinative fact is the intention as it existed at the time of the transaction. That intention cannot be vitiated by changed circumstances or subsequent actions bred in the cold light of tax consequences.

Petitioners argue that actions taken subsequent to the date of transfer, when combined with the original event, clearly establish the real intention of the parties. They rely upon the confirmation of the loan by the directors of Building Inc. and Investment and the execution and acceptance of the note. This action was not undertaken until 2 months after the transaction in issue occurred. No explanation is given of why nothing was done or said at the July 25, 1946, meeting. While the confirmation and note would ordinarily be some evidence, other facts present in the record destroy their probative value. The actions taken were tardy, and undertaken only after reflection and a shift in opinion. Petitioners would overlook the interlocking control between Investment and Building Inc. What was done was not the act of independent directors, i.e., it was not the result of bargaining between parties, each looking after his own self interest. Saigh acted on both sides and, indeed, guided and engineered the entire transaction step by step.

The note was payable on demand and carried only one-eighth of 1 percent interest. The alleged debt was secured by 20,000 shares of Building Inc. However, the decision to demand repayment, or actually to repay, rested in the same hands. Similarly, the security given was of no moment since, here again, the decision to enforce payment and take the stock rested in the same parties. *William C. Baird*, *supra*.

Investment conducted no business of its own and had no earnings at that time. Petitioner did not demonstrate any expected source of revenue with which Investment anticipated making the repayment. It does not appear whether Building Inc. had a generous dividend record in the past, and we must discount this factor as a possible source. The interest rate of one-eighth of 1 percent would seem to indicate limited and meager resources on the part of Investment. Building Inc. was paying 3¾ percent on this same money. This is

not a case of a loan to a going business which, though lacking present means of repayment, has every expectation of continuing in business and based on a record of past earnings anticipates earning sufficient profits with which to pay its debts. It would be reasonable to infer that Investment did not expect to repay, and Building Inc. did not expect to be repaid.

Not to be overlooked is the fact that no interest was ever paid and no repayment of any part of the principal amount ever made.

These factors belie any real creditor-debtor relationship or any intention to create such a relationship.

Petitioners also argue that the books and records of the interested parties reflect the transfer as a loan. While this is evidence to be considered, it is not controlling, and its effectiveness is weakened by the fact that petitioners have not produced evidence which indicates how the parties treated the transaction around June 29, 1946. We have a Building Inc. balance sheet as of December 31, 1947, and a tax return dated March 15, 1947, indicating that the funds were carried as a note receivable, and an Investment balance sheet received by the Mercantile Bank & Trust Company in 1950 indicating a note payable. These records are too far removed in time from the actual date of the transfer to be persuasive. *M. Jackson Crispin*, 32 B.T.A. 151.

Petitioners rely further upon the agreement of April 1, 1944, later confirmed by supplemental agreement of June 29, 1946, to the effect that Building Inc. would not declare a dividend without permission if the dividend would reduce its net current assets below $100,000. On the basis of this agreement, petitioners reason that the transfer of funds by Building Inc. to Investment must have been a loan since if it were a dividend it would have violated the contract. Petitioners also argue that when the May Department Stores Company and May Building Company sold the note of Building Inc. underlying the contract, the vendors warranted that the contract was not breached.

According to the totals given in the statement of assets and liabilities of Building Inc. as of June 28, 1946, its total current assets would not have fallen below $100,000 if the transfer of $2,205,000 on June 29, 1946, was in fact a dividend. While we do not take the figures in this statement as conclusive, petitioners have not placed the full financial picture of Building Inc. before us. This June 28 statement, when coupled with the statement of the attorney for May Department Stores Company that he did not really concern himself with this question, lessens the effect to be accorded the argument.

Even if we were to grant petitioners' last argument full weight, we would be forced to balance it against the fact that Missouri law appears to forbid a corporation from making loans to its shareholders. See sec. 351.165, Mo. Ann. Stat. (Vernon). Assuming, as we must, that Building Inc. acted properly, such fact indicates that the trans-

fer was in fact a dividend rather than a loan. *M. Jackson Crispin, supra.*

Based on the record as a whole, we are constrained to find that petitioners have failed to prove that the 1946 transfer was not an informal dividend distribution within the intendment of section 115(a). *William C. Baird, supra; Elliott J. Roschuni, supra; M. Jackson Crispin, supra.*

Petitioners argue that they are not liable as transferees at law or in equity for the alleged liability of Investment. Under the facts there can be no serious charge of fraud in the transfer of assets after the liquidation, and we need not discuss the point.

While it is not entirely apparent from petitioners' brief, it seems that they advance two theories in support of their position. Relying on *United States* v. *Brown*, 86 F. 2d 798 (C.A. 6), and *Vestal* v. *Commissioner*, 152 F. 2d 132 (C.A.D.C.), they contend that respondent is barred from proceeding against them by reason of the application of the doctrines of estoppel and/or election of remedies as applied by the Federal courts. Secondly, based on the Supreme Court decision in *Commissioner* v. *Stern*, 357 U.S. 39, they argue that the existence and the extent of transferee liability must be determined by application of the Missouri law. Petitioners would place respondent in the "shoes" of an ordinary creditor in Missouri, and determine his right to recover under that law. Missouri law makes available to defendants generally the defenses of estoppel, laches, and election. These defenses would be important, so petitioners argue, in determining the extent of their liability in Missouri. See *Robert Leslie Bowlin*, 31 T.C. 188.

As a factual basis to support the stated defenses, petitioners call our attention to the following facts: The transfer of funds now alleged to be a dividend occurred on June 29, 1946. In 1952 respondent's agent made an examination into the transactions and, as evidenced by his reports, became fully aware of the facts surrounding the transaction. On the basis of these reports, respondent allocated interest payable to the insurance company on that part of the funds transferred to Investment, and which had been paid by Building Inc., to Investment on the ground that Investment really had the benefit of the money. As a consequence the petitioners, as transferees of the dissolved corporation, were required to pay the resulting additional tax liability. By the time the respondent sent the notices of deficiencies in these cases, the applicable statutes of limitations barred a refund. Similarly, after the 1951 liquidation of Investment, the individual petitioners reported the appropriate gain or loss on the transaction. Taxes were paid with respect to the transaction without consideration of whether Investment was liable for a large personal holding

surtax. Except as to the petitioners in Docket Nos. 63355 and 63356, recovery of the taxes paid is barred.

Upon the examination of the Federal estate tax return of Robert E. Hannegan, deceased, respondent determined deficiencies resulting from increasing the valuation of Investment's stock. This value was considered without diminution for any liability on the part of Investment for personal holding company surtaxes. The estate paid the deficiencies. Any recovery of the additional taxes paid is now barred. Sec. 322, I.R.C. 1939. The question of whether the mitigating effects of section 3801 are applicable to these facts has not been raised and we need not decide whether that section is or will become applicable.

Respondent received notice of the contemplated liquidation and he was requested to make a prompt audit. Approximately 4 years passed between the examination of the transaction by respondent and the date of the notices of deficiency.

Without entering upon a lengthy discussion of the elements of estoppel, as applied by this and other Federal courts, in our view the facts do not warrant a finding that respondent is estopped to proceed in this case on a dividend theory. Petitioners had the burden of proving the application of the doctrine and we hold that they failed to do so. *United States Trust Co. of New York*, 13 B.T.A. 1074.

We need only comment that there was no fraud, concealment, misrepresentation, omission, negligence, violation of duty, or unfair conduct on the part of respondent. There is absent in these cases that element of error or fault by respondent. Both parties were aware of all the facts surrounding the 1946 transaction. It cannot be said that petitioners were in the dark with respect to what respondent was doing in 1952. This being the case, we cannot say that petitioners were misled or actually relied upon any representation or omission of the respondent.

It is apparently petitioners' position that it is sufficient here to establish that they were harmed by respondent's actions with respect to their returns (including that of the Estate of Robert E. Hannegan) in 1952. Respondent's determination of additional taxes against petitioners was made without regard to the alleged liability of Investment for personal holding company surtaxes. Similarly, additional taxes were collected from petitioners because of respondent's action in allocating the interest deduction to Investment. If petitioners felt that respondent's determinations in 1952 were erroneous, they were free to adopt a different theory and pursue it through the judicial machinery provided by law. The record does not indicate that they followed even the administrative remedies available in respondent's office to review an agent's actions. In fact, it was to petitioners' apparent advantage for respondent to proceed as he did. If there was harm, it was in large measure of petitioners' own doing and not be-

cause of some fact hidden from petitioners by respondent. Knowing all the facts at the time, petitioners cannot sit idly by when respondent's theory is erroneous, although to their advantage, and then claim estoppel when respondent seeks to retrace his steps and proceed down the correct path. Cf. *Sugar Creek Coal & Mining Co.*, 31 B.T.A. 344; *Tide Water Oil Co.*, 29 B.T.A. 1208; *South Chester Tube Co.*, 14 T.C. 1229.

The cases (*Brown* and *Vestal*) relied upon by petitioners actually involve the doctrine of election of remedies, but to the extent that they deal with estoppel, they concern estoppel by decision of this Court, and hence are distinguishable from the instant facts.

Petitioners argue that by allocating the interest deduction from Building Inc. to Investment, respondent chose to treat the transaction as a loan and thus elected a remedy inconsistent with the present dividend theory. We are not able to determine that the allocation under section 45 of the Internal Revenue Code of 1939 is inconsistent with a dividend approach. According to petitioners' own argument, the allocation was premised on the idea that Investment was really enjoying the benefits of the money and should be charged with the interest deduction on that part of the insurance company's loan which it received from Building Inc. This does not necessarily mean that the transfer of funds from Building Inc. to Investment was not a dividend. In any case, an election of remedies presupposes a choice between two equally available remedies. In this case the transfer was a dividend, and respondent was duty bound so to treat it. He had no option but to tax it as a dividend. If he treated it as a loan, he took a path not open to him. Having no choice in the matter, respondent cannot be said to have made an election of remedies. Cf. *Goldstein* v. *United States*, 227 F. 2d 1 (C.A. 8).

Respondent here was in reality mistaken in his impression of the law. He is at liberty to correct that mistake. *Automobile Club* v. *Commissioner*, 353 U.S. 180. It was his duty to determine the correct tax liability of the parties here involved and he has authority to change any determination considered erroneous. The mere fact that the revenue agent referred to the transfer as a loan in his reports does not estop the Commissioner. Cf. *Birch Ranch & Oil Co.*, 13 T.C. 930, affirmed on another issue 192 F. 2d 924 (C.A. 9); *Catharine D. Sharpe*, 38 B.T.A. 502, affd. 107 F. 2d 13 (C.A. 3); *Frances P. McIlhenny et al., Executors*, 13 B.T.A. 288, affd. 39 F. 2d 356 (C.A. 3).

Petitioners appear also to raise the defense of laches. Section 276 (a), I.R.C. 1939, provides as follows:

SEC. 276. SAME—EXCEPTIONS.

(a) FALSE RETURN OR NO RETURN.—In the case of a false or fraudulent return with intent to evade tax or of a failure to file a return the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time.

In so legislating, Congress has fixed the limitation time which applies in the case where no return was filed. No personal holding company return for 1946 was filed by Investment. The statute of limitations did not commence to run and the assessment of the personal holding surtax was not barred. *Commissioner* v. *Lane-Wells Co.*, 321 U.S. 219. The prescribed time in which the Commissioner could act having been fixed, we are not at liberty to shorten or lengthen that time for any reason, including any theory of laches. Cf. *Phillips* v. *Commissioner*, 283 U.S. 589; *United States* v. *Summerlin*, 310 U.S. 414; *Tobacco and Allied Stocks* v. *Transamerica Corp.*, 143 F. Supp. 323 (D. Del.), aff'd. 244 F. 2d 902 (C.A. 3).

The Supreme Court in *Commissioner* v. *Stern, supra,* promulgated the rule to be followed in transferee cases, as follows (pp. 42, 44, 45):

> The courts have repeatedly recognized that § 311 neither creates nor defines a substantive liability but provides merely a new procedure by which the Government may collect taxes. * * * Therefore, since § 311 is purely a procedural statute we must look to other sources for definition of the substantive liability. Since no federal statute defines such liability, we are left with a choice between federal decisional law and state law for its definition.
>
> *   *   *   *   *   *   *
>
> * * * we hold that, until Congress speaks to the contrary, the existence and extent of liability should be determined by state law.

This being the law with reference to substantive transferee liability, we are required to look to the law of Missouri to determine the right of the respondent to assert the deficiencies against the petitioners in these cases. Under Missouri law, respondent's right to recover via the equity route [3] is circumscribed by the defenses of estoppel, election, and laches.

In *Osburn* v. *Court of Honor*, 152 Mo. App. 652, 133 S.W. 87, 89–90, the Springfield Court of Appeals stated the Missouri view of equitable estoppel as follows:

> Equitable estoppels or estoppels in pais grow out of the acts and declarations of the parties sought to be charged and are applied for the prevention of fraud, and to prevent a person who has been influenced by such acts and declarations from the injury of a denial. In order to constitute an estoppel, three things must be shown: (1) That the parties have done some act or made a declaration inconsistent with the truth for the purpose of securing the action of the other parties; (2) that the parties alleging the estoppel were ignorant of the truth and relied upon such acts and declarations; and (3) that injury would result to them

---

[3] It would appear that respondent is proceeding in equity. His argument on brief does not specify the exact theory which he relies upon under Missouri law. Ordinarily, liability at law is predicated on an agreement of the transferee to pay the obligations of the transferor or a State statute requiring the transferee of assets to pay the tax-liability of the transferor. No agreement or statute exists in these cases. Furthermore, it would seem that section 351.565, Mo. Ann. Stat. (Vernon), in creating a 2-year statute of limitations on the right to sue on predissolution causes of action, provides a limitation incident to or inherent in the substantive right, and as such it might be interpreted as extinguishing the substantive remedy after 2 years. If such were the case, respondent would be barred at law. See 3 Beale, Conflicts of Laws, secs. 603.1–605.1.

by the denial. * * * But it is the policy of the law "to guard estoppels strictly because estoppels may exclude the truth."

The Supreme Court of Missouri, in *Rhoads* v. *Rhoads*, 342 Mo. 934, 119 S.W. 2d 247, stated the rule thus:

The rule as to such estoppel is considered, with citation of numerous authorities, in Grafeman Dairy Co. v. Northwestern Bank, 290 Mo. 311, 235 S.W. 435, wherein it is held that if both parties know the facts or have equal means of ascertaining them there can be no estoppel, and the court quotes (290 Mo. 311 loc. cit. 336, 235 S.W. 435, loc. cit. 443) the rule as stated in Bigelow on Estoppel, 5th Ed., p. 470, thus: "First. There must have been a false representation or a concealment of material facts. Second. The representation must have been made with knowledge, actual or virtual, of the facts. Third. The party to whom it was made must have been ignorant, actually or permissibly, of the truth of the matter. Fourth. It must have been made with the intention, actual or virtual, that the other party should act upon it. Fifth. The other party must have been induced to act upon it."

This rule was further explained by the Supreme Court of Missouri in *Central States Life Ins. Co.* v. *Bloom*, 345 Mo. 982, 137 S.W. 2d 517:

The basis of estoppel is "that a person is held to a representation made or a position assumed when otherwise inequitable consequences would result to another who, having the right to do so under all the circumstances of the case, has, in good faith, relied thereon"; but that ordinarily "mere expressions of opinion by interested persons cannot, although subsequently shown to be groundless or false, be regarded as misrepresentations for the purpose of creating an estoppel"; * * *

See also *Board of Education* v. *St. Louis County*, 347 Mo. 1014, 149 S.W. 2d 878; *Prouse* v. *Schmidt*, 156 S.W. 2d 919; *United Finance Plan* v. *Parkview Drugs*, 250 S.W. 2d 181.

Thus, we find that Missouri Courts treat estoppel much the same as we treat it and as it was developed in this and other Federal courts. Our remarks above are equally applicable here. We have no representations by respondent which were inconsistent with the truth. Petitioners were not ignorant of the facts surrounding the 1946 transaction and could not have been misled by respondent. Such being the case, there could be no estoppel under Missouri law. Although the agent's report considered the transfer of funds from Building Inc. to Investment as a loan, this was but a mere expression of opinion by a subordinate and forms no basis for estoppel under Missouri law.

The rule concerning election of remedies in Missouri was stated in *Pemberton* v. *Ladue Realty & Construction Co.*, 359 Mo. 907, 224 S.W. 2d 383, 385:

"It is equally well settled that there can be no election of remedies unless two or more inconsistent remedies exist, and before a party can be held to have elected his remedy, or be estopped from asserting a different remedy, he must have known at the time he proceeded of the existence of more than one available remedy. We must not lose sight of the distinction between pursuit of one of two inconsistent remedies and pursuit of an imaginary or mistaken remedy.

It is obvious from the record before us that plaintiff did not have two remedies in point of fact. That he misconceived his rights and pursued a supposed remedy to which he was not entitled, is not enough to prevent him from pursuing one to which he is entitled. * * *"

See also *State* v. *Holt*, 348 Mo. 982, 156 S.W. 2d 708; *Brown* v. *Essig*, 1 S.W. 2d 855.

Sweeping aside the question of whether the allocation under section 45 of the Internal Revenue Code of 1939 was actually inconsistent with dividend treatment, we have stated above that respondent had no choice but to treat the 1946 transfer as a dividend. His mistaken pursuit of a loan theory, if such was the case, cannot form a basis for holding that respondent has made an election under Missouri law.

Laches, as applied in Missouri courts, is an equitable remedy which cannot be invoked to defeat justice. A mere lapse of time is never sufficient to support laches. *Bickel* v. *Argyle Inv. Co.*, 343 Mo. 456, 121 S.W. 2d 803. Only 4 years elapsed between the date when respondent came into possession of the facts and the date he acted. In our view, no Missouri court would hold that sufficient to bar respondent for being tardy in asserting his rights.

No other argument with respect to transferee liability having been raised by petitioners, we hold that they are liable as transferee of Investment.

We need not decide whether petitioners would have been entitled to an offset, counterclaim, or recoupment under Missouri law for the additional taxes paid. Section 272(g) of the Internal Revenue Code of 1939 provides as follows:

(g) JURISDICTION OVER OTHER TAXABLE YEARS.—The Board in redetermining a deficiency in respect of any taxable year shall consider such facts with relation to the taxes for other taxable years as may be necessary correctly to redetermine the amount of such deficiency, but in so doing shall have no jurisdiction to determine whether or not the tax for any other taxable year has been overpaid or underpaid.

A finding that petitioners are entitled to an offset, counterclaim, recoupment, or other such relief would, of necessity, require us to find that an overpayment had been made in taxable years not before us. We have no jurisdiction so to do. *Commissioner* v. *Gooch Co.*, 320 U.S. 418; *Rothensies* v. *Electric Battery Co.*, 329 U.S. 296.

The issue here concerns further the amount of the earnings and profits of Building Inc. accumulated as of December 31, 1945, and for the year 1946.

Divested of the multitudinous details, the basic facts are these: The associates secured long-term leases on city block No. 128. They decided to erect a building on the site. To carry through with such plan, two corporations were created: Building Co. and Annuity. Annuity was assigned the leases on condition that it sublet the premises

to Building Co.[4]  Building Co. was to construct the building, with approximately one-half the construction costs to be raised by issuing its own bonds.  The remainder was to be raised by the issuance of Annuity certificates.  Building Co. actually was slated to pay (and its successor in fact repaid) all of the funds borrowed by Annuity.

Petitioners contend that Building Inc. had an aggregate cost basis with respect to two assets, the building and the leasehold, in the amount of $4,691,963.64, made up as follows:

| | |
|---|---:|
| Net liability with respect to Annuity certificates | $2, 700, 000. 00 |
| Mortgage bonds | 1, 750, 000. 00 |
| Miscellaneous liabilities | 241, 863. 64 |
| Reversionary rights | 100. 00 |
| Total | 4, 691, 963. 64 |

Petitioners further contend that this entire cost should be allocated to the building and that the additional depreciation for the period 1924 to 1945, inclusive, and for the calendar year 1946 should not be less than $1,281,878.78 and $42,452.29, respectively.

The leases were held as security for the certificate holders.  The record establishes that the leases in themselves were valueless, because of the large ground rent, if Building Co. defaulted on the certificates. The protection or source of equity for the certificates was the building which had been constructed in part with funds obtained from their sale.  The building was of sufficient value to protect the interests of both the bond and certificate holders.  The leases were to be assigned to Building Co. after the retirement of the certificates.  When such event occurred the assignment included not only the leases but Annuity's interests in the building.

The record suggests to us that the reason for not transferring the leases outright to Building Co. in 1912 was to provide some device to reach the building.  Since two separate corporations were involved, the building, title of which rested in Building Co., could not be reached except through a forfeiture device.  See *Commissioner* v. *H. F. Neighbors R. Co.*, 81 F. 2d 173 (C.A. 6).

Annuity did not borrow the money for its own purposes.  The proceeds ended in the coffers of Building Co., not Annuity.  Annuity profited nothing by the transaction.  Building Co. actually had the obligation to repay the loan (such being settled before the certificates were ever issued), to pay all the costs including those arising from the operation of Annuity, and to pay the ground rent on the leases.  Nor can we lose sight of the fact that the various manipulations here were always under tight control because the syndicate managers and various shareholders and directors were a closely knit group.  It may be, as

---

[4] The parties made no arguments concerning the fact that the initial sublease to Building Co. was executed prior to Mar. 1, 1913.  In view of the fact that Annuity issued a new sublease in 1924, no issue is raised in this respect.

sometimes is the case, that two corporations were utilized on the prospect that the two could borrow more in the aggregate than one could separately.

Looking through form to substance we find that Building Co. raised the necessary construction funds by borrowing on bonds and certificates. This the respondent recognized in permitting Building Co. depreciation on the basis of its actual cost in constructing the building. The record before us indicates that the cost of the leases was actually no more than an undertaking to pay the excessive ground rents.

Such was the situation when Building Inc. stepped into Building Co.'s "shoes" in 1924. It sought depreciation on the same basis used by Building Co. The respondent, however, determined that Building Inc. was not entitled to use the cost basis of its predecessor but could use as its cost only the costs or obligations which Building Inc. paid or assumed in 1924. He excluded from this basis the obligations assumed on the certificates, but included the bonds. Nevertheless, to obtain the building, Building Inc. had to undertake to repay the funds borrowed to construct the building, i.e., pay off the bonds and certificates. If Building Inc. defaulted on payment of the certificates, the holders could foreclose, terminate the leases, and take the building subject to the bondholders' equity. As to the leases, it had to assume the payment of the ground rents just as had its predecessor.

We see no reason for treating the certificates differently from the bonds. The proceeds from the sale of the certificates were used to build the building. There is no basis for treating the certificates as the cost of the leases. Annuity did not sell the leases to Building Co. and did not receive any rent in the true sense of the word for subleasing the premises. Actually, it proceeded to borrow $3 million and then loaned it to Building Co. to construct the building. What Building Co. undertook was to repay that money. The sublease was at best a security device. Surely the certificate holders would not accept leases with no market value as security. If we "short cut" the circuitous route taken here, we see that Building Co. in substance issued the certificates. Building Inc. assumed this obligation. Its cost basis for the building was the price of paying off the certificates. It was the complete owner of the building after the retirement of the certificates and bonds. Building Inc., or its predecessor, bore the entire cost of the building's construction and it was entitled to the statutory deduction for that cost. Cf. *Commissioner* v. *Revere Land Co.*, 169 F. 2d 469 (C.A. 3); *Frank G. Shattuck Co. et al.*, 2 B.T.A. 7. This deduction should be spread over the projected life of the building. Secs. 23 and 114, I.R.C. 1939; Regs. 111, secs. 29.23(a)–10 and 29.23(1); *Duffy* v. *Central R.R.*, 268 U.S. 55. Even if we should say that Building Inc. assumed the bonds and certificates in order to ob-

tain the building *and the leaseholds*, the testimony establishes that the leaseholds had no value in 1924.

Rents paid for leases, of course, do not form a cost basis for depreciating the leases. However, the lessee is entitled to depreciate the costs, other than rent, of acquiring the lease.[5]

If it be said that our holding here, that Building Inc. is entitled to depreciate the cost of paying off the certificates, is somewhat at variance with the prior method of treating depreciation by the parties, we are, nonetheless, guided by the record before us and not by their unconfirmed prior actions. Cf. *Gowran* v. *Commissioner*, 87 F. 2d 125 (C.A. 7).

The next issue is whether the failure to file a personal holding company return was due to reasonable cause. Petitioners argue that the failure to file the return was due to the fact that "reasonable" men could differ in their opinion or interpretation of the 1946 transaction. If the transfer of funds from Building Inc. to Investment was a loan, then Investment would have no personal holding company income and there would be no need to file a return. We have held that the transfer was a dividend and hence a return should have been filed.

To support their argument, petitioners point to the fact that the revenue agent knew that Investment was a personal holding company, was acquainted with the facts surrounding the transfer, referred to the transfer as a loan in his reports, and yet said nothing concerning the need for the filing of such a return.

Although the agent indicated a full knowledge of the transaction, still he did not have the year 1946 before him, and there is no showing that he brought his ability to bear on the question of whether the transfer was a loan or whether a personal holding return should have been filed. The cases cited by petitioners involve the actions of agents who were considering the year in dispute and are distinguishable from the instant facts.

Secondly, although reasonable men might differ on the effect of the transfer, petitioners failed to show that they consulted a lawyer or other tax counsel concerning the transactions of 1946 or that they relied upon any competent advice received on the matter. Indeed, there is no showing that petitioners themselves considered the question, even though they were aware of all the facts.

We conclude that petitioners have failed to show reasonable cause for failure to file a personal holding company return for the year in question and therefore are liable for the addition to tax. *Coshocton Securities Co.*, 26 T.C. 935; *Hermax Co.*, 11 T.C. 442, affd. 175 F. 2d 776 (C.A. 3); *Tarbox Corporation*, 6 T.C. 35.

The final question is the amount of interest petitioners are to be charged with in this case. The rule in this respect has long been

---

[5] We have found that this does not include the cost of the certificates.

regarded as settled. It is stated fully in *Henry Cappellini*, 16 B.T.A. 802, as follows:

While the courts seem to hold divergent views as to when interest begins to run against stockholders who are liable to creditors of a corporation, we are impressed with the decision in United States v. Snook, 24 Fed. (2d) 844, as being a fair and equitable rule to be applied in transferee cases. That decision, where the tax liability was greatly in excess of the amount received by the transferees in distribution, holds the transferees liable to the full extent of the amounts received by them with interest from "the fair average date of receiving" the sums distributed. Cf. *McWilliams* v. *Excelsior Coal Co.*, 298 Fed. 844. That method of computation represents the maximum liability of the transferees and applies where the tax and interest imposed on the corporate transferor is greater than the amount received in distribution, plus interest from that date. Where the tax and interest thereon is less than the amount distributed to any one transferee, then the liability of such transferee would be limited to the amount of tax and interest thereon.

Petitioners do not seriously contend that the rule is otherwise. Instead, they seek to bring themselves within the recent exception carved out by *Voss* v. *Wiseman*, 234 F. 2d 237 (C.A. 10), and subsequently followed in various District Courts. As we read that case, it stands for the proposition that, absent *malum fides*, a transferee cannot be held accountable for interest prior to the time when he has notice of the existence of a debtor-creditor relationship between himself and the Government, if the transferees receive assets which are not of sufficient value to cover the interest assessed. This matter may be settled under Rule 50.

*Decisions will be entered under Rule 50.*