W. T. Wilson, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Wilson Bros. & Co., Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Docket Nos. 11852, 11853. Promulgated February 5, 1948.

*George M. Naus, Esq., C. N. Whitehead, C. P. A.*, and *A. Thomas Murphy, C. P. A.*, for the petitioners.

*T. M. Mather, Esq.*, for the respondent.

**OPINION.**

JOHNSON, *Judge*: 1. Petitioner assails the determination that withdrawals of $47,500 (stipulated, however, to be $45,000) in 1939 and of $16,000 in 1940 were dividends paid to him by the corporation and not loans, as he contends. He stresses in support of his view the informal understanding between his brother and himself when their mother's gift of cash was contributed to paid-in surplus; the charging of the withdrawals to their personal accounts; the crediting of them to the corporation's accounts receivable; and some repayments made by each shareholder. By section 115 (a) of the Internal Revenue Code a dividend is defined to be any distribution made by a corporation to its

shareholders out of earnings or profits, and by 115 (b) "every distribution is made out of earnings or profits to the extent thereof." Hence petitioner's withdrawals are to be deemed dividend distributions, as determined, unless he can affirmatively establish their character as loans, and since the corporation was wholly owned by the two withdrawers, their control invites a special scrutiny. *Ben R. Meyer*, 45 B. T. A. 228.

We are of opinion that the evidence indicates dividends rather than loans. While true that the absence of notes, the failure to pay interest, and the lack of a written agreement are not of themselves conclusive of this view, it is equally true that the recording of withdrawals in accounts receivable and the credits entered in such accounts are likewise inadequate to establish loans. The issue must be decided upon an examination of all the pertinent facts found, and when they are examined, the emerging picture is that of two brothers, always closely associated in business, who own and completely control a corporation to which they jointly contributed over a million dollars in cash as paid-in surplus and from which they drew money at will, making occasional returns of lesser amounts credited to their accounts. The ceiling for such withdrawals and the obligation to repay them on call, being unevidenced by written agreement or corporate resolution, could have been changed by an oral understanding between the brothers as easily and as informally as it was made. Such a vague arrangement is not determinative for tax purposes; and, as the corporation had earnings and profits in 1939 and 1940, we hold that the withdrawals were dividend distributions to the extent thereof. *Ben R. Meyer, supra; James J. Gravley*, 44 B. T. A. 722; *Moses W. Faitoute*, 38 B. T. A. 32; *Roy J. Kinnear*, 36 B. T. A. 153; dismissed (C. C. A., 9th Cir.), 95 Fed. (2d) 997; *George P. Marshall*, 32 B. T. A. 956; *M. Jackson Crispin*, 32 B. T. A. 151. Petitioner cites *Weaver* v. *Commissioner* (C. C. A., 9th Cir.), 58 Fed. (2d) 755, as to the contrary, but we perceive a material distinction in that the $100,000 which was therein contributed to a corporation by its several shareholders under an oral understanding that it would be returned, was simultaneously repaid to all in the exact amount of each one's contribution.

The Commissioner's determination that the withdrawals were dividends is sustained as to $45,000 in 1939 and $16,000 in 1940.

2. The corporation paid $12,000 to petitioner and $18,000 to F. A. Wilson in 1938 as salary and so paid to each $8,000 in 1939, 1940, and 1942, and $6,000 in 1941. Under the view that the services of each were worth no more than $3,000 in each year, the Commissioner disallowed to the corporation the deduction of the excess paid above that amount and treated such excess as dividends, not salary, in determining petitioner's tax for each of those years. Both determinations are assailed.

To justify the salary paid, petitioner and his brother testified that each devoted an average of 35 hours a week to business of the corporation. As the corporation ceased to deal in lumber in 1938, such services were limited to care of investments, maintenance of the schooners, and efforts to sell or lease them. There is also testimony that a search was made for a lumber supply with which to revive the corporation's lumber business, but this purpose seems hardly consonant with the transfer of its retail business to petitioner in 1938 and efforts to dispose of the schooners which had been used in that business. While the investment portfolio had a market value in excess of $800,000 during the years in controversy, the witnesses mentioned in general terms only "slight changes in holdings" and the purchase of stock with the proceeds of some matured bonds. They stressed the need for following market reports closely, work on income tax matters, and attention to the schooners (which, however, were not in operation or even seaworthy) and their repeated but unsuccessful efforts to sell or lease them. They also stressed that no salaries were paid them prior to 1936, but such prior years are not in controversy.

We are not persuaded that the value and extent of the brothers' services to the corporation were as great as they asserted. Petitioner was operating a lumber business of his own, from which he reported a gross annual income of from $127,000 to $187,000, and F. A. Wilson, a member of the San Francisco Stock Exchange, was operating a brokerage firm. Under such circumstances, it is not reasonable to suppose that their principal activities were connected with affairs of a personal holding company, which held only securities and "laid up" lumber boats, and their testimony confirms rather than rebuts this view. Neither could cite any steady corporate business, but referred vaguely to occasional need for attention to the boats, occasional efforts to sell or lease them, to tax work, and to "slight changes" in investments. On these facts, we deem an annual salary of $6,000 for each reasonable and reverse the Commissioner's determination to this extent. Cf. *Wagegro Corporation*, 38 B. T. A. 1225.

3. Petitioner was a trader in securities, and, having borrowed shares from a broker to maintain a "short" position, he paid the lender $3,900 in 1939, $4,150 in 1940, and $4,400 in 1941 as the equivalent of dividends on such shares. He also paid a premium or fee of $20 in 1939 and $339.85 in 1941. The Commissioner determined that "amounts of $3,900.00, $4,150.00 and $4,736.00" paid as dividends on borrowed stock were "not allowable as deductions from gross income, but are held to be a part of the cost of stock purchased to cover the short sales." Petitioner assails this determination as error, and we agree. Amounts so paid "were not incurred as an incident to either the acquisition or the sale of the property involved, but were more in the nature of carrying charges incurred during the progress of the deal," and they are de-

ductible. *Commissioner* v. *Wiesler* (C. C. A., 6th Cir.), 161 Fed. (2d) 997; affirming 6 T. C. 1148; certiorari denied, 332 U. S. 842; *Commissioner* v. *Wilson* (C. C. A., 9th Cir.), 163 Fed. (2d) 680; certiorari denied, 332 U. S. 842.

4. In determining the corporation's personal holding company surtax for the years 1938–1942, the Commissioner disallowed as deductions the amounts representing depreciation and expenses connected with the two schooners, although such amounts were deducted in his determination of the corporation's income tax. The corporation assails the disallowance and respondent defends his action on the ground that the schooners were not property of the kind required by section 505 (b), Internal Revenue Code, to support the deduction. This section, defining Subchapter A net income for computation of surtax on a personal holding company, limits the deductions available under section 23 (a), relating to expenses, and section 23 (1), relating to depreciation, to an amount equal to rent or other compensation from the property affected, unless it is established to the Commissioner's satisfaction:

(1) That the rent or other compensation received was the highest obtainable, or, if none was received, that none was obtainable;

(2) That the property was held in the course of a business carried on *bona fide* for profit; and

(3) Either that there was reasonable expectation that the operation of the property would result in a profit, or that the property was necessary to the conduct of the business.

Since the corporation derived no income whatever from the boats, it is entitled to the deductions claimed only if it proves that the three conditions are fulfilled in respect of them.

In our opinion, fulfillment of none of the conditions has been affirmatively shown. The boats were "laid up" in 1929, and while plausible that they could not have been leased during the depression, we can not believe that leasing or income-producing operation was impossible in 1938 and succeeding years, especially after the outbreak of war. Petitioner and his brother admitted that offers to buy or lease them were received. They failed to give any details or explain the business justification for refusing all of them, and, since the boats could have been made seaworthy, we can not on this record make the essential finding that some income could not have been obtained from them. As the corporation ceased to deal in lumber in 1938 and the boats had not been used since 1929, it is manifest that they were not held in the course of the corporation's business, and that they were not necessary to the conduct of its business. Petitioner's professed wish to lease or sell them, indeed, is so indicative. Conceivably, there could have been a "reasonable expectation that the operation of the property would result in a profit," but petitioner's testimony, directed to estab-

lishing that the boats could not be used, leased, or sold advantageously, even though not convincing, obviously does not support an affirmative finding that they could have been.

In his brief petitioner's counsel urges that section 505 (b) be interpreted according to its spirit, rather than its letter; he quotes excerpts from a report of the Congressional Joint Committee on Tax Evasion and Avoidance (75th Cong., 1st sess., House Document No. 337) and from other official statements to show that its provisions were intended to deny deductions to a corporation formed by a wealthy taxpayer with no other purpose than to hold his securities and pleasure yachts and enjoy deductions to which the taxpayer individually would not be entitled. Petitioner's corporation, it is argued, was organized for a genuine business purpose and does fall within the class envisaged by the statute. We agree that in its genesis and original operation petitioner corporation bore no resemblance to the personal holding company which the legislation was designed to cover. But, during that period it actively engaged in the lumber business, and, we may presume, derived more than 20 per cent of its income from that business, so that it did not then qualify as a personal holding company and was not subject to the taxing provisions here considered. But its status changed in 1938; it discontinued the lumber business; its assets consisted almost entirely of securities, having a market value in excess of $800,000, and two lumber boats; it became in effect for its two stockholder brothers "the incorporated pocketbook," which Congress had in mind in enacting section 505 (b). It is not material that the boats were not yachts. The significant fact is that, if the brothers had owned them directly, they would not have been entitled to deductions for depreciation and maintenance expense, because the boats were not used in a business or transaction for profit. And in our opinion it was the intention of Congress in enacting 505 (b) that the corporation holding them be in no more favorable a position for claiming such deductions. Accordingly, we sustain the Commissioner's disallowance.

5. The corporation charges error in that the Commissioner failed to allow credit for dividends paid "beyond $12,000" in 1941, $23,500 in 1942 and a dividend carry-over of $21,414.71 from 1937. Just what additional credits are sought is not clear from the assignment of error, but in a stipulation the Commissioner "concedes" that the corporation "paid a cash dividend of $12,000.00 in December 1940, at the rate of $6,000.00 each to F. A. Wilson and W. T. Wilson." On brief, petitioner contends that any parts of the salaries which may be disallowed should likewise be treated as dividends paid, while respondent, adverting to shareholders' withdrawals, which he contends and which we hold to have been dividend distributions, argues that, since different amounts were distributed to each shareholder, no additional credit should be

given the corporation because the distribution was not pro rata, as required to support a credit by section 27 (h), Internal Revenue Code, and he stresses that this section has been strictly construed. *Safety Convoy Co.* v. *Thomas* (C. C. A., 5th Cir.), 139 Fed. (2d) 219. See also *Black Motor Co.* v. *Commissioner* (C. C. A., 6th Cir.), 125 Fed. (2d) 977. Obviously, the condition is not met in respect of the withdrawals and the $6,000 special fee paid to F. A. Wilson in 1938, and no dividends paid credit should be allowed on account of those distributions. *Spring Street Realty Co.* v. *Commissioner* (C. C. A., 3d Cir.), 123 Fed. (2d) 146, affirming a memorandum opinion entered July 21, 1941. But as the regular salaries paid and the excesses disallowed were equal and therefore proportionate to shareholdings, the amounts of the excesses should be reflected in the credits sought. The same is true of the $12,000 covered by stipulation.

In addition the parties have stipulated that the corporation is entitled to a number of itemized expense deductions in addition to those allowed by the Commissioner, and these should be reflected in the computation of tax.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*