James C. O'Keefe and Ruth O'Keefe v. Commissioner. J. Barry O'Keefe and Bette O'Keefe v. Commissioner.
O'Keefe v. Commissioner
Docket Nos. 80364, 80365.
United States Tax Court
T.C. Memo 1961-59; 1961 Tax Ct. Memo LEXIS 291; 20 T.C.M. (CCH) 310; T.C.M. (RIA) 61059; February 28, 1961
*291 John N. Vander Vries, Esq., and Walter F. Mehrlich, Esq., 111 W. Monroe St., Chicago, Ill., for the petitioners. Erving Sodos, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The Commissioner determined deficiencies in income tax for the calendar year 1954 as follows: Docket
No.
Deficiency
James C. and Ruth O'Keefe
80364
$2,162.78
J. Barry and Bette O'Keefe
80365
3,017.82
The sole issue presented is whether the transfer of life insurance policies having a cash surrender value of $24,142.09 for $12,071.04 to James J. O'Keefe as part of the consideration in a stock acquisition from James J. O'Keefe by J. Barry O'Keefe and James C. O'Keefe constitutes an informal dividend of $12,071.04 to the petitioners. Findings of Fact Some of the facts have been stipulated and are incorporated herein by reference. Petitioners, James C. and Ruth O'Keefe, are husband and wife as are petitioners J. Barry and Bette O'Keefe. They reside in Oak Park, Illinois, and their joint individual income tax returns on a cash receipts and disbursements basis were filed for the calendar year 1954 with the director *292 of internal revenue at Chicago, Illinois. A coal business, O'Keefe Bros. Coal Company, hereinafter referred to as the Coal Company, was founded by John A. O'Keefe, the father of petitioners James C. and J. Barry O'Keefe, and John's brother, James J. O'Keefe. The corporation was organized under the laws of the State of Delaware, with authorized, issued and outstanding capital stock consisting of 1,500 shares of common stock of a par value of $100 per share. As a result of the untimely death of his son in September 1953, James J. decided to conclude his active participation in the corporate affairs of the Coal Company and negotiations were commenced with his brother John with a view to the sale of his stock holdings in the Coal Company. At that time the stock of the Coal Company was held as follows: Relationship to
James C.
Stockholder
and J. Barry
Shares
James C. O'Keefe
75
J. Barry O'Keefe
75
James J. O'Keefe
Uncle
750
Mary B. O'Keefe
Mother
200
Frank A. Barry
Uncle
300
Mary F. Mulholland
Sister
50
Joseph D. O'Keefe
Brother
50
A series of negotiations culminated in the execution of a formal contract of sale between James J. O'Keefe, *293 the owner of 750 shares, the Seller, and J. Barry O'Keefe, Purchaser, executed on January 2, 1954, the pertinent provisions of which are: NOW, THEREFORE, the Seller agrees to sell and the Purchaser agrees to purchase all of the said shares of stock of the Seller for the price of $150,000.00 to be paid as follows: $15,000.00 at the execution and delivery of this agreement, receipt whereof is hereby acknowledged by the Seller, and the entire balance within thirty (30) days from the date hereof. If the Purchaser defaults in that respect, then, at the option of the Seller, said down payment of $15,000.00 shall be forfeited as liquidated damages and this agreement thereupon shall become null and void. * * *
On payment by the Purchaser of the full amount of such purchase price to the Seller, Seller agrees to assign, deliver and transfer to Purchaser, the certificates representing said shares of stock and the resignation of Seller as a director and officer of said O'Keefe Bros. Coal Company. And, whereas, one of the assets of said O'Keefe Bros. Coal Company consists of an insurance policy on the life of the Seller, in which said O'Keefe Bros. Coal Company is designated as the beneficiary, *294 which policy, at present, has a surrender value of approximately $25,000. Purchaser agrees to cause said O'Keefe Bros. Coal Company to transfer and deliver to Seller, all its right, title and interest in and to said policy and the proceeds thereof, upon payment by Seller to said O'Keefe Bros. Coal Company of the sum of $12,500 and to make, execute and deliver to Seller a full acquitance and release of all liability or obligation for the payment of the balance, or any part thereof, in consideration of payment therefor by the Purchaser to said O'Keefe Bros. Coal Company. Although Barry O'Keefe was designated in the contract as the purchaser, he was acting not only on his own behalf but also for his brother James C. O'Keefe, each purchasing 375 shares and paying one-half of the purchase price. Thereafter, James J. O'Keefe transferred the 750 shares of stock upon receipt of the $150,000 from James C. O'Keefe and J. Barry O'Keefe. James J. O'Keefe then resigned as secretary and treasurer and director of the Coal Company and purchased from the Coal Company insurance policies having a cash surrender value of $24,142.09 for $12,071.04 and received from the corporation a complete release *295 from any claims by the corporation in connection with the policies. On January 12, 1954, at a special meeting of the Board of Directors of the Coal Company, James J. O'Keefe's resignation was accepted and authorization given for the sale of the insurance policies with a "full release and discharge" from liability to the corporation regarding the policies. The transaction was recorded on the books of the corporation as a charge directly to surplus for the difference between the cash surrender value of the policies and the amount received from James J. O'Keefe. After the stock acquisition J. Barry and James C. O'Keefe as their salary each took one-half the amount that James J. O'Keefe would have received had he remained with the corporation, which amounted to approximately $23,500 each. In 1956 each took a voluntary reduction in salary of $2,500 due to a decline in business resulting from the competition of gas and oil. A continuation of this condition in addition to the purchase of several other coal companies, resulted in a reduction of the corporation's working capital. To remedy this situation, J. Barry O'Keefe and James C. O'Keefe permitted salary checks to remain in the company *296 for from two to five months to provide additional working capital. The transaction with regard to the insurance policies was never recorded on the books of the corporation as an indebtedness owing by petitioners, no writing evidencing the obligation was ever given by J. Barry O'Keefe and James C. O'Keefe, no security was pledged, no date for repayment was ever specified, and neither interest payments nor payments in reduction of the principal indebtedness were ever made. During the entire period at issue the current and accumulated earnings and profits of the Coal Company were in excess of $12,071.05. A taxable dividend of $12,071.05 was realized by petitioners J. Barry O'Keefe and James C. O'Keefe when as part of the consideration for the sale of James J. O'Keefe's 750 shares of stock in the Coal Company to petitioners, the Coal Company transferred to James J. O'Keefe for $12,071.04 insurance policies having a total cash surrender value of $24,142.09. Opinion This case presents a variation of the familiar question of whether cash withdrawals by stockholders of a corporation constitute informal dividends or a bona fide indebtedness. Here, instead of withdrawing cash from the *297 corporation, the petitioner stockholders "[caused]" the corporation to transfer an asset (the insurance policies) having a value of some $24,000, to their uncle pursuant to the contract described in our findings of fact. In return the corporation received some $12,000 from the uncle and petitioners claim they became indebted to the corporation for the balance. The Commissioner determined that the petitioners thus received a dividend from the corporation to the extent of $12,000 (in round figures). On the other hand, petitioners argue that pursuant to the contract they became indebted to the corporation in that amount, which indebtedness has been periodically acknowledged. Whether the satisfaction by a corporation of a personal obligation owed by stockholders creates an indebtedness or is a dividend [1] is a factual question to be resolved upon consideration of all the attendant facts and circumstances and depends upon the intent of the parties. Wiese v. Commissioner, 93 F. 2d 921 (C.A. 8, 1938), certiorari denied 304 U.S. 562 (1938), rehearing denied 304 U.S. 589 (1938); Clark v. Commissioner, 266 F. 2d 698 (C.A. 9, 1959), affirming *298 a Memorandum Opinion of this Court. A presumption of correctness attaches to the Commissioner's determination that it was a dividend and it is incumbent upon the petitioners to establish by a preponderance of the evidence the existence of a bona fide indebtedness. We think the petitioners have failed in the discharge of this burden. We are convinced after an examination of all the evidence that at the time of the execution of the contract of sale the petitioners had no intention of paying the remaining one-half of the cash surrender value of the insurance *299 policies to the corporation. Clark v. Commissioner, supra; Ben R. Meyer, 45 B.T.A. 228 (1941); W. T. Wilson, 10 T.C. 251 (1948), affd. on another issue, 170 F. 2d 423 (C.A. 9, 1948); William C. Baird, 25 T.C. 387 (1955). In support of their contention that a bona fide indebtedness to Coal Company was created, petitioners claim they have acknowledged their indebtedness on numerous occasions and have adduced testimony to substantiate these declarations. We are of the opinion that such declarations are not conclusive in the absence of other affirmative acts evidencing a bona fide indebtedness. If such verbal utterances were sufficient to relieve the taxpayer of his burden of proof the taxpayer could in almost every case conform his retrospective intention to his present tax advantage. Wiese v. Commissioner, supra.In those cases in which we have held an indebtedness to exist there were, in addition to the taxpayer's declaration of indebtedness, consistent repayments, al Goodman, Inc., 23 T.C. 288 (1954), Carl L. White, 17 T.C. 1562 (1952); insufficient earnings, Rollin C. Reynolds, 44 B.T.A. 342 (1941), *300 Victor Shaken, 21 T.C. 785 (1954); execution of a note, Estate of Helene Simmons, 26 T.C. 409 (1956), Estate of Isadore Benjamin, 28 T.C. 101 (1957); and stock pledged to secure the debt, Carl L. White, supra. The question of the corporation's right to enforce the obligation against the petitioners would seem to be academic in light of the fact that the Coal Company was a closely held corporation controlled by the petitioners and their immediate family. This close relationship is exemplified by the petitioners' testimony that as a result of a shortage in working capital they were often compelled to leave their salary checks in the corporation for from two to four months. However, at no time during these periods did the corporation make a demand upon the petitioners for payment of the obligation nor did the petitioners make payments or apply any part of their salary checks to offset the indebtedness. Cf. Carl L. White, supra. Also significant is the fact that the alleged indebtedness was never recorded on the corporate books as such. Instead, the transaction was recorded as a charge directly to surplus for the difference *301 between the cash surrender value of the policies and the amount received from James J. O'Keefe. Although there was testimony that due to the sudden illness of the auditor of the corporation an accountant unfamiliar with the situation closed the books in 1954 and this accounted for the omission, no explanation was given why an adjusting entry was not made later to rectify this error. Furthermore, there was testimony by an agent of the Commissioner to the effect that the alleged indebtedness was never revealed by the petitioners or their representatives during the audit of their income tax returns. This evidence coupled with the fact that no notes were executed, no interest was paid, no time was specified for repayment, no security arrangements were made, and that the earnings and profits were adequate for dividends, although not conclusive, presents a composite picture of the transaction which we do not think depicts the petitioners as contemplating that they in fact owed anything to the corporation. The Commissioner's determination is sustained. Decisions will be entered for the respondent. Footnotes
1. (I.R.C. 1939). SEC. 115. DISTRIBUTIONS BY CORPORATIONS. (a) Definition of Dividend. - The term "dividend" when used in this chapter * * * means any distribution made by a corporation to its shareholders, whether in money or in other property, (1) out of its earnings or profits accumulated after February 28, 1913, or (2) out of the earnings of profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made. * * *↩