General Aggregates Corporation v. Commissioner.
General Aggregates Corp. v. Commissioner
Docket No. 80322.
United States Tax Court
T.C. Memo 1962-27; 1962 Tax Ct. Memo LEXIS 282; 21 T.C.M. (CCH) 121; T.C.M. (RIA) 62027; February 9, 1962
*282 Held, on the facts advancements by a corporation to petitioner, which was the principal stockholder of said corporation, were dividends rather than loans, consequently petitioner was liable for personal holding company surtax under section 500, I.R.C. of 1939. Bertram H. Loewenberg, Esq., 75 Federal St., Boston, Mass., for the petitioner. Raymond T. Mahon, Esq., for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: The respondent determined deficiencies in petitioner's income tax and personal holding company surtax for the years 1951 and 1952 as follows: Income Tax
Taxable Year
Deficiency
1951
$ 3,814.79
1952
1,620.14
Personal Holding Company Surtax
1951
$71,747.43
1952
29,025.42
*283 The issue is whether petitioner received personal holding company income in the form of dividends in the years 1951 and 1952 in the amounts of $89,314.15 and $36,962.69, respectively. Findings of Fact Some of the facts have been stipulated and they are found accordingly. The petitioner, General Aggregates Corporation, is a Massachusetts corporation organized in 1944. It had 14,941 shares of Class A stock (entitled to 5 percent cumlative dividend) with a par value of $1 a share and 54,538 shares of Class B stock with a par value of $1 per share. Each share of Class A and Class B stock was entitled to one vote. George S. Wilbur owned 5,395 shares of Class A stock and 150 persons unrelated to Wilbur owned the balance of Class A stock, or 9,546 shares. Wilbur owned 14,293 shares of Class B stock, and his wife, son and daughter, owned a total of 40,000 shares of Class B stock. During the years in question more than 50 percent in value of the petitioner's outstanding stock was owned by four individuals, namely, George S. Wilbur, Martha Wilbur, his wife, George, Jr., and Helen Wilbur, children of George and Martha. Petitioner's income tax returns for the years 1951 and 1952 were *284 filed with the district director of internal revenue for the district of Massachusetts. Highland Sand & Gravel Company, Inc. (hereinafter sometimes called Highland) is a Massachusetts corporation organized in 1930. It was actively engaged in the sand and gravel business. It had 589 shares of no par value Class A stock (entitled to $8 per share cumulative dividend) and 10,000 shares of no par value Class B stock. Class A and Class B stockholders were both entitled to one vote per share. The Class A stock was owned: 138 shares by George S. Wilbur; 96 shares by Wilbur's wife; 115 shares by Wilbur's son; and 100 shares by Wilbur's daughter - making a total of 449 shares owned by the Wilbur family. The balance of Class A, or 140 shares, was owned by persons unrelated to the Wilburs. All 10,000 shares of Class B stock were owned by petitioner. Highland was at all times actively engaged in the sand and gravel business. At all times here in issue George S. Wilbur was, until his death on November 21, 1952, the president and principal executive officer of petitioner and Highland. Sometime in 1950, George S. Wilbur conceived the idea of establishing a high class dining and social center *285 in Beverly, Massachusetts. On or about September 26, 1950, George S. Wilbur leased from the owners for a period of 10 years certain real estate located in Beverly, Massachusetts. The lease covered part of a building known as Lodge Pole Ranch and approximately 7 acres of land. The lease recited that the premises were to be used by Wilbur "for carrying on a high-class business of serving food to the public." On or about May 18, 1951, George S. Wilbur caused to be organized Chateau Montserrat, Inc., (hereinafter sometimes called Chateau), a Massachusetts corporation formed for the purpose of conducting a restaurant business on the said Beverly real estate. The books of the petitioner and of Chateau Montserrat, Inc. show that one-half of the capital stock of Chateau was paid for by the petitioner and that petitioner paid $5,000 for said stock. The said books show that the petitioner also paid to Chateau as a payment for capital stock the amount of $3,500, which amount was charged by petitioner to the account of George S. Wilbur. On the books of Chateau, Lillian E. Aarons was credited with the said amount of $3,500 plus a later credit in the amount of $1,500 for out-of-pocket expenses *286 paid by her for the benefit of Chateau. On the books of Chateau, Lillian E. Aarons was shown as the owner of the other one-half of the capital stock of Chateau in the amount of $5,000. Lillian E. Aarons had been employed by George S. Wilbur for many years in a secretarial capacity. No stock certificates were ever issued by Chateau Montserrat, Inc. George S. Wilbur did not communicate his plans for establishing the restaurant or the organization of Chateau to the members of his family or the other officers of petitioner or Highland. He used a Beverly law firm, not the attorneys for petitioner or Highland, to organize Chateau. He became a director of Chateau immediately after it was organized, and he completely dominated the corporation. During the year 1951 the petitioner received $64,000 from Highland Sand & Gravel Co., Inc., by 7 checks as follows: June 11, 1951
$25,000
July 17, 1951
5,000
August 27, 1951
10,000
September 14, 1951
7,000
October 17, 1951
6,000
November 19, 1951
3,000
December 14, 1951
8,000 On the books of Highland these payments were shown as a credit to cash and a debit to the account of the petitioner. On the books of the petitioner *287 these payments were shown as a debit to cash and a credit to Highland. On January 1, 1951, petitioner had on deposit with the First National Bank of Boston the sum of $60,516.94. This was petitioner's only bank account during the years in question. George S. Wilbur, as treasurer of the petitioner, had sole authority to draw checks on this account. Between January 1 and May 31, 1951, no deposits were made in this account and on May 31, 1951, the balance in the said account had been reduced to $516.34. Between June 1 and December 31, 1951, the only deposits to this account were the seven payments made by Highland to the petitioner aggregating $64,000 described above, plus $80.60 deposited in June 1951, and $1,200 deposited in October 1951. During the year 1951 the petitioner made payments from this account which were unrelated to the Chateau project aggregating $29,966.50. The balance of the moneys in said account was paid to or spent for the benefit of the said Chateau project in 1951, as set forth below. During the period from January 1, 1951 to June 10, 1951, the petitioner paid amounts aggregating $36,334.93 to various vendors in payment for materials or labor in connection with *288 the construction and fitting out of the so-called Chateau Montserrat Restaurant located on the real estate referred to above. These payments were shown on petitioner's books as a credit to cash and a debit to an account opened in the name of each vendor. During the remainder of 1951, beginning with a check dated June 11, 1951, the petitioner made similar payments to vendors supplying materials or labor for the Chateau Montserrat Restaurant in the amount of $27,247.92. These payments were also shown on petitioner's books as a credit to cash and a debit to an account in the name of the vendor. The petitioner's books reflect that as of December 31, 1951, the foregoing payments aggregating $63,582.85 were charged to the account of Highland and credited to the accounts of the said vendors. During the period January 1 through June 10, 1961, the petitioner, in addition, made payments to five vendors for services and equipment furnished by them to the Chateau Montserrat Restaurant aggregating $4,452.50. These five transactions were shown on petitioner's books as a credit to cash and a debit to the account of Chateau Montserrat. On August 15, 1951, petitioner also made a payment in the amount *289 of $283 to a vendor furnishing services to the Chateau Montserrat Restaurant. On petitioner's books this transaction was shown as a credit to cash and a debit to the account of Chateau. These transactions were all recorded on the Chateau books as a debit to the particular asset or expense account and a credit to the account of the petitioner. During the year 1951 petitioner also made 7 payments directly to Chateau on various dates beginning on May 24 and ending on December 17 in the aggregate amount of $27,000. On petitioner's books these transactions were shown as credits to cash and debits to the account of Chateau. The Chateau books in turn showed these payments as a debit to cash and a credit to the petitioner. On December 31, 1951, the books of Chateau show a debit to the petitioner's account in the amount of $18,447.82 and a corresponding credit to the following expense accounts: Labor
$17,888.88
Social Security Tax
199.63
Unemployment Tax
359.31 On December 31, 1951, the books of the petitioner show a credit to the Chateau in the amount of $18,447.82 and a corresponding debit to the account of Highland in the amount of $18,447.82. This sum of $18,447.82 *290 represents assets and expenses either paid for by the petitioner and charged to Chateau during the year or paid for by Chateau with moneys paid directly to it by the petitioner, as hereinbefore described. During 1951 Highland made payments aggregating $25,314.15 directly to George S. Wilbur, which he in turn paid either to Chateau or to vendors supplying materials or labor for the construction and fitting out of the restaurant. On the books of Highland these payments were shown as a credit to cash and a charge to the George S. Wilbur Special Account. By an entry dated December 31, 1951 on Highland's books, these amounts were charged to the petitioner's account and the George S. Wilbur account was credited in the like amount of $25,314.15. On the books of the petitioner no entries reflecting the receipt or disbursement of the $25,314.15 were shown in its cash receipts or cash disbursements accounts. By entries dated May 1, 1951 and December 31, 1951, the petitioner's journal shows that the said payments were reflected in the first instance as a credit to Highland and a debit to the account of Chateau or the various vendors in question, as the case may be. The final entries in petitioner's *291 journal show that the said accounts of Chateau and the vendors were credited by the same amounts with which they had been debited, and Highland's account was charged by the same amount with which it had been credited. The amounts referred to above that were paid to or for Chateau were used in connection with the installation and fitting out of the restaurant. The source of all these payments was the $64,000 which petitioner received from Highland, the $25,314.15 which George S. Wilbur received from Highland and the balance of the funds petitioner had on hand January 1, 1951. At the end of 1951 the books of Highland reflected the receipt of a statement prepared by George S. Wilbur on behalf of the petitioner showing the following disbursements: For machinery, equipment and
installation
$ 86,617.59
For improvements to leased
property
6,905.07
For interest paid on equipment
notes
314.15
For cash advanced to labor
18,447.82
$112,284.63 Entries were made on the books of Highland crediting petitioner's account in the amount of $112,284.63 and debiting the asset and expense accounts previously referred to. Included in the said statement aggregating $112,284.63 *292 and recorded on the books of Highland, as aforesaid, were three payments made early in 1952 to vendors furnishing equipment to the said restaurant, as follows: Wm. H. Cann & Son, Inc.
$2,549.51
Thompson-Winchester Co.
1,000.00
Greenlaw Electric Co.
2,320.89
During the taxable year 1952 the petitioner received $34,500 from Highland, as follows: Date
Amount
January 14, 1952
$7,000
February 20, 1952
2,500
March 14, 1952
1,000
March 21, 1952
2,000
April 10, 1952
3,500
April 30, 1952
500
May 23, 1952
3,000
June 20, 1962
$3,000
July 23, 1952
3,000
August 22, 1952
3,000
September 23, 1952
3,000
October 22, 1952
3,000 With the exception of a $1,700 deposit in July 1952, which is not material to the issue here involved, said amounts totaling $34,500 were deposited in petitioner's bank account and represent the only deposits made therein during 1952. On Highland's books these payments were shown as a credit to cash and a debit to the petitioner. On the petitioner's books these amounts were shown as a debit to cash and a credit to Highland. From said checking account $2,549.51 was paid to Wm. H. Cann & Son., Inc. and $1,000 was *293 paid to Thompson-Winchester Co. $31,000 was paid directly by petitioner to Chateau Montserrat; the said payments totaling $31,000 were shown on petitioner's books as a credit to cash and a debit to Chateau. On the books of Chateau the said payments were shown as a debit to cash and a credit to the account of the petitioner. The following checks on the dates and in the amounts indicated represent disbursements made by the petitioner from its bank account to or for the benefit of Chateau: Date
Amount
January 14, 1952
$ 300.00
January 14, 1952
2,700.00
January 16, 1952
2,549.51
January 16, 1952
1,000.00
January 30, 1952
750.00
February 20, 1952
2,000.00
March 14, 1952
1,000.00
March 21, 1952
2,000.00
April 14, 1952
2,300.00
April 30, 1952
500.00
May 23, 1952
2,800.00
June 23, 1952
3,000.00
July 8, 1952
200.00
July 23, 1952
3,000.00
August 4, 1952
300.00
August 12, 1952
500.00
August 22, 1952
3,500.00
August 28, 1952
250.00
September 23, 1952
3,000.00
October 22, 1952
3,000.00
During the year 1952 Highland paid directly to George S. Wilbur the sum of $2,320.89. This amount was shown on Highland's books as a credit to cash and a *294 debit to the petitioner's account. Wilbur paid this amount directly to Greenlaw Electric Company for work and materials furnished to Chateau. This sum was recorded on the books of Highland as of December 31, 1951 as a part of the $112,284.63 referred to above. No promissory notes were ever executed by the petitioner with respect to the payments made to it by Highland in the amounts of $64,000 and $34,500 nor did the petitioner ever furnish any security for the repayments of these moneys. Highland never charged any interest on these payments and petitioner never paid any interest to Highland with respect to these payments. The petitioner never repaid these amounts to Highland in cash, but charged them back to Highland in the manner and to the extent indicated above. No promissory notes were ever executed by the petitioner or by George S. Wilbur for the amounts of $25,314.15 and $2,320.89 which George S. Wilbur received from Highland. Neither the petitioner nor George S. Wilbur ever furnished any security for the repayment of these amounts. Highland never charged any interest on these amounts and neither the petitioner nor George S. Wilbur ever paid any interest to Highland on these *295 amounts. Neither the petitioner nor George S. Wilbur repaid these amounts to Highland in cash, but these amounts were charged back to Highland in the manner and to the extent indicated above. The earnings and profits of Highland were as follows for the years indicated: Earnings and Profits
Increase (or Decrease)
Earnings and Profits
Year
at Beginning of Year
During Year
at End of Year
1945
($ 4,106.60) deficit
($ 2,234.43)
($ 6,341.03) deficit
1946
( 6,341.03) deficit
23,472.46
17,131.43
1947
17,131.43
42,657.89
59,789.32
1948
59,789.32
84,021.51
143,810.83
1949
143,810.83
57,634.72
201,445.55
1950
201,445.55
78,609.26
280,054.81
1951
280,054.81
31,775.81
311,830.62
1952
311,830.62
(17,952.49)
293,878.13
For the taxable years 1932 to 1952, inclusive, Highland paid no dividends to its stockholders and made no distributions with respect to any of its stock. The accumulated dividend arrearage with respect to the Class A stock of Highland was approximately $94,000 as of December 31, 1952. The books of Highland reflect no payments to petitioner debited to surplus in either 1951 or 1952. The books of petitioner reflect no *296 amounts received from Highland as credits to income during 1951 or 1952, except for certain amounts of rental income unrelated to the matter here at issue. During 1951 and 1952 the directors of both the petitioner and Highland Sand & Gravel Co., Inc. were George S. Wilbur, Robert Davison and George S. Wilbur, Jr. George S. Wilbur died on November 21, 1952. Robert Davison died on November 20, 1959. With the exception of the following statement contained in the annual stockholders' meetings: "VOTED: That all transactions, acts and doings of the stockholders and of the Board of Directors and officers of the corporation during the year just ended be and the same hereby are in all respects approved, ratified, confirmed and accepted." the minutes of the directors' meetings and the minutes of the stockholders' meetings of the petitioner and of Highland for the taxable years 1951 and 1952 contain no indication that the stockholders or directors of these corporations, other than George S. Wilbur, had any knowledge of the Chateau Montserrat project, or Mr. Wilbur's participation therein, or of the payments described above. Chateau opened its restaurant for business in 1951. The business *297 was unsuccessful and the restaurant was closed late in 1952, shortly after George S. Wilbur's death. Chateau was liquidated early in 1953. The fixtures and other personal property belonging to the corporation were sold on or about January 21, 1953. The net balance from the sale of the property in the amount of $1,400 was paid to the estate of George S. Wilbur. There are no entries on the books of the petitioner, of Chateau, or of Highland showing that Highland purchased any of the capital stock of Chateau. Respondent determined that the advancements in the amounts of $89,314.15 and $36,962.69 constituted dividend income to petitioner and that petitioner qualified as a personal holding company and was liable for surtax imposed on such companies. Opinion Section 501, Internal Revenue Code of 1939, [1] defines a personal holding company as a corporation where more than 50 percent in value of the stock is owned by not more than five individuals and 80 percent of the corporation's gross income during the taxable year is "personal holding company income as defined in section 502." The definition of "personal holding company income" in section 502 includes "dividends". It is admitted *298 the stock ownership requirement of section 501 is present here. Wilbur, his wife, son and daughter, owned more than 50 percent in value of General Aggregates Corporation stock. The only question is whether 80 percent of its gross income during 1951 and 1952 was dividends. Petitioner was the principal stockholder of Highland, holding 10,000 shares of Highland's 10,589 shares of stock and during said years it received substantial advancements from Highland. Also during 1951 and 1952 Highland's earnings and profits totaled $311,830.62 and $293,878.13, respectively. Petitioner owned one-half of Chateau's stock. It is stipulated that in 1951 and 1952 Highland paid over to petitioner the amounts of $64,000 and $34,500, respectively. It is also stipulated that during said years Highland paid either to Chateau's creditors or to Wilbur to be used for Chateau's restaurant project the sums of $25,314.15 in 1951 and $2,320.89 in 1952. If the advancements to petitioner and the advancements to Wilbur to be used for Chateau are dividends as respondent determined, then petitioner is liable *299 for dividend and personal holding company income. Petitioner's position is that all of the above payments were loans by Highland to petitioner. Whether the advancements by Highland to petitioner, its principal stockholder, were loans or dividends is a question of fact upon which petitioner had the burden of proof. W. T. Wilson, 10 T.C. 251. The question is really one of intent. Did the parties really intend that Highland's disbursements to and for the benefit of petitioner in 1951 and 1952 were loans that were to be repaid? In the instant case the answer must be gleaned from circumstantial evidence. Both petitioner and Highland were completely dominated by Wilbur and he was the president and treasurer of Chateau. None of the other stockholders or officers of petitioner or Highland knew anything about the advancements at the time they were made or, indeed, about Chateau and petitioner's connection with that corporation until after Wilbur's death in November 1952. Consideration must be made of all of the facts and circumstances to see if the true purpose was to create loans at the time when the advancements were made. Advancements which were not intended to be loans when *300 made are dividends to the extent of earnings and profit. Section 115(a) and (b). And this is so even though they have no reference to the proportions in which the stock is held. Elliott J. Roschuni, 29 T.C. 1193, affirmed 271 F. 2d 267. Respondent on brief argues the following circumstances support his determination that the payments constitute dividend income to petitioner: (1) No promissory notes were ever executed by the petitioner with respect to the payments made by Highland during 1951 and 1952. (2) The petitioner did not furnish any security for the repayment of the amounts which it received from Highland. (3) The petitioner did not agree to pay any interest and it did not, in fact, pay any interest on the amounts which it received from Highland during 1951 and 1952. (4) The money which Highland paid out to or for the petitioner's benefit during 1951 and 1952 has never been repaid to Highland. (5) There was never any understanding or plan between the petitioner and Highland as to the time and manner in which the petitioner was to repay Highland. (6) Highland never instituted suit or took any other steps to collect the amounts which it *301 paid out to or for the petitioner during 1951 and 1952. (7) The petitioner had what was tantamount to absolute control of Highland so that it was within petitioner's discretion as to whether the withdrawals should be made in the form of dividends or otherwise. (8) Highland never declared any dividends or made any distributions with respect to its stock from 1932 to 1952, inclusive, in spite of the fact that its earnings and profits were increasing steadily and substantially. In our opinion the record shows the withdrawals by petitioner of Highland's funds constituted distributions of earnings by Highland or dividends, and did not represent loans. Probably the most conclusive factors against petitioner's contention is the failure to have any provision for repayment and the failure to make repayment. Elliott J. Roschuni, supra.Any argument that the advancements were loans is almost totally destroyed by the fact that many years after the advancements they have not been repaid. It will not do for petitioner to explain that it did not have the money to repay the so-called loans. It held 10,000 shares of Highland stock and it could cause Highland to declare a dividend *302 or it could cause Highland to redeem some of its outstanding stock that it held, as payment of the so-called loan. Petitioner was never engaged in a business that might in time produce income that could be used to repay the advancements. Its only asset, aside from Highland stock, was a parcel of realty rented to Highland for $1,200 a year. The only circumstances which petitioner seems to feel favors its loan theory are the book entries that recorded the transactions on the books of petitioner and Highland and the fact that in 1954 or 1955 petitioner transferred a parcel of realty to Highland allegedly in partial payment of its indebtedness. The manner in which the withdrawals are handled on the books is an important factor ( Victor Shaken, 21 T.C. 785) but not controlling ( Irving T. Bush, 45 B.T.A. 609). But here the book entries are not consistent with petitioner's theory that the withdrawals were loans. It is true that the initial entries with respect to the withdrawals were, with the exception of the $25,314.15 paid to Wilbur in 1951, all recorded in the books of both corporations as if they were loans from Highland to petitioner. Even the said payment *303 to Wilbur, which was used for petitioner's benefit, was first shown on Highland's books as a charge to Wilbur and later in 1951 changed to a charge to petitioner. However, the subsequent bookkeeping entries are not at all consistent with petitioner's position that Highland was loaning it money. Petitioner and Highland in effect treated petitioner's payments in 1951 to or for Chateau as repayment of the withdrawals. Highland had no connection with Chateau and owned no stock in Chateau. Petitioner was a 50 percent stockholder in Chateau and the sums it spent for Chateau could not be expenses of Highland. To a limited degree the same procedure was followed in 1952, however most of the money which Highland paid out in 1952 is still shown as an outstanding open account on the books of both corporations. The record shows that Wilbur completely dominated the entries that were made on the books of both corporations. These entries were made before his death on November 21, 1952. The most that can be said for the book entry evidence is that some of it would be consistent with petitioner's loan theory and some would not. As previously stated petitioner's only asset, aside from its 10,000 *304 shares of Highland, was a parcel of realty with a building thereon which it rented to Highland for $1,200 a year. A witness who was a director of Highland in 1954 or 1955 testified that in one of those years this realty was transferred to Highland for a price "in the vicinity of $25,000." He said Highland did not pay $25,000 cash to petitioner but "[it] was deducted, as far as I know, from a bill that they [petitioner] owed to Highland Sand and Gravel." This evidence does not show that at the time of the advancements loan transactions were contemplated. It is not clear from this testimony that the realty transfer was in fact a partial payment of Highland's advancements. At any rate the transfer was made two or three years after Wilbur's death and it hardly supports an inference that the corporate intent in 1951 and 1952 was to make loans to petitioner. We hold for respondent on the issue presented. The advancements in the stipulated sums of $64,000 and $25,314.15 in 1951 and $34,500 and $2,320.89 in 1952, were dividends. Petitioner was a personal holding company during said years and is therefore liable for the surtax. Decision will be entered under Rule 50. Footnotes
1. All section references are to the Internal Revenue Code of 1939, as amended, unless otherwise noted.↩